Filed 10/20/22
See concurring and dissenting opinion

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| CITY OF LOS ANGELES, | B310118 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC574690) |
| v. | |
| PRICEWATERHOUSECOOPERS, LLC, | |
| Defendant and Respondent. | |


APPEAL from an order of the Superior Court of Los Angeles County, Elihu M. Berle, Judge. Reversed and remanded.

Office of the City Attorney, Michael N. Feuer, Kathleen A. Kenealy, Joseph A. Brajevich; Browne George Ross O'Brien Annaguey & Ellis, Ellis George Cipollone O'Brien Annaguey, Eric M. George, Guy C. Nicholson and Kathryn L. McCann for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Casey J. McCracken, Daniel J. Thomasch, Lauren J. Elliot and Joseph M. Ortega for Defendant and Respondent.

_____

A defendant in a civil lawsuit filed a motion for sanctions under Code of Civil Procedure sections 2023.010 and 2023.030 of the Civil Discovery Act (Discovery Act; § 2016.010 et seq.) nine months after the case was dismissed with prejudice, seeking monetary sanctions for egregious misuse of the discovery process while the litigation was pending.[1]  The trial court awarded $2.5 million in sanctions.  On appeal from the postjudgment order, in response to a letter from this court inviting additional briefing pursuant to Government Code section 68081, the sanctioned party contends the Discovery Act does not authorize the trial court to award monetary sanctions under section 2023.030 alone or together with section 2023.010.

We hold that monetary discovery sanctions may be imposed under section 2023.030 only to the extent authorized by another provision of the Discovery Act.  Section 2023.010 describes conduct that is a misuse of the discovery process, but does not authorize the imposition of sanctions.  The plain language of the statutory scheme does not provide for monetary sanctions to be imposed based solely on the definitional provisions of sections 2023.010 or 2023.030, whether construed separately or together. We conclude that the sanctioned party met its burden on appeal to show error, because the award of monetary sanctions was not authorized by the statutes cited.

The trial court was authorized by other provisions of the Discovery Act, however, to impose some amount of monetary sanctions in connection with rulings in favor of the defendant on discovery motions during the litigation.  We cannot evaluate on this record whether the sanctions awarded may have been an

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

appropriate exercise of the trial court's discretion under other discovery provisions because the defendant presented its costs in the motion below based on the general categories of misconduct described in section 2023.010, rather than on the defendant's reasonable expenses incurred as a result of sanctionable conduct under discovery provisions other than sections 2023.010 and 2023.030.  Because the question of the court's authority to award sanctions under sections 2023.010 and 2023.030 was not squarely raised in the trial court, and no prior case law held that the statutory language of section 2023.030 requires monetary sanctions to be authorized by another provision of the Discovery Act, the order in this case must be reversed and remanded to allow the defendant to present the issue of sanctions to the trial court for determination under the correct law.

The sanctioned party has raised two additional contentions on appeal that must be addressed.  First, the sanctioned party asserts that the trial court had no jurisdiction to rule on a motion for monetary sanctions under the Discovery Act after the case was dismissed with prejudice.  We hold that when the court is authorized under a provision of the Discovery Act to impose monetary sanctions, the court retains jurisdiction after the lawsuit is dismissed to rule on the issue of discovery sanctions as a collateral matter.  Second, the sanctioned party contends that the motion for sanctions was untimely.  We hold that the timeliness of a motion for monetary sanctions following a successful discovery motion is a matter within the trial court's discretion, and no abuse of the court's discretion has been shown. We reverse the postjudgment order awarding sanctions and remand for a new determination on the issue of discovery sanctions.

# FACTUAL AND PROCEDURAL BACKGROUND

## Billing Errors

In 2010, plaintiff and appellant City of Los Angeles entered into a contract with defendant and respondent PricewaterhouseCoopers, LLC (PWC) to modernize the billing system for the Los Angeles Department of Water and Power (LADWP).  Using new billing software introduced in 2013, the City failed to accurately bill a significant portion of its customers.  LADWP customers began filing lawsuits against the City over billing disputes.

On March 6, 2015, the City's special counsel Paul Paradis, Gina Tufaro, and Paul Kiesel, along with the City's attorneys Michael Feuer, Thomas Peters, Joseph Brajevich, Richard Tom, and Eskel Solomon, filed the instant action against several defendants, including PWC.  The City alleged PWC fraudulently induced the City to enter into the contract for the billing system and breached the contract.

On April 1, 2015, Ohio attorney Jack Landskroner, on behalf of plaintiff Antwon Jones, filed a class action lawsuit against the City based on the billing errors (the class action).  Without filing an answer, the City entered into mediation in the class action in June 2015.  The parties to the class action entered into a preliminary settlement agreement on August 7, 2015.  The trial court judge in this case presided over both the class action and the City's civil case.

**<u>Discovery Begins</u>**

On December 21, 2015, PWC served requests for production of documents related to remediation of the billing system and the alleged damages. "Remediation" included identifying the overcharges, issuing refunds to customers, and correcting the defects in the billing system. The City served responses, refusing to provide documents for a majority of the requests. On June 8, 2016, PWC served a second set of requests seeking documents concerning remediation, to which the City served responses.

After informal conferences, the parties reached a discovery agreement. The City served a privilege log on January 20, 2017, that identified more than 19,000 documents as privileged. Approximately 1,200 of the documents were listed as protected by the attorney-client privilege, but did not show an attorney as the sender or recipient. Approximately 17,000 of the documents were listed as protected attorney work product, but did not show an attorney as the sender or recipient, and the documents did not appear to disclose the mental impressions of an attorney. Most of the documents were described as investigation at the direction of counsel concerning remediation.

One of the documents listed as protected attorney work product was described as an initial complaint for a lawsuit entitled *Jones v. PWC*, dated January 24, 2015, with a cover letter from attorney Eskel Solomon in the city attorney's office to several LADWP employees and attorneys.

5

## PWC Motion to Compel Granted in Part and Denied in Part

On February 3, 2017, PWC filed a motion to compel the documents withheld by the City as privileged that were not authored by an attorney, written to an attorney, and did not appear to disclose the mental impressions of an attorney. At a March 6, 2017 hearing on the motion, PWC suggested there was no true adversity of interest in the class action proceedings. Rather than seeking to minimize damages, the City's intent had been to identify and refund all of the overcharges, which would become part of the City's accounting of damages. PWC argued that documents were not privileged simply because an attorney had instructed LADWP employees to perform the work or because the documents were sent to an attorney. PWC also argued that the privilege was waived by showing the documents to third party consultants and opposing counsel. The common interest privilege did not apply, because a party does not have a common interest with its litigation adversary. In response, the City's special counsel Paradis argued strenuously that all of the documents constituted attorney work product.

The court granted PWC's motion to compel in part and denied it in part. The court ordered production of the documents withheld based on attorney work product, because the work of programmers, computer technicians, and other third parties involved in remediation was predominately related to a business purpose and not privileged under the work product doctrine.

The court denied the motion to compel as to the documents withheld on the basis of attorney-client privilege, but ordered the City to revise the privilege log entries to be specific enough to

allow the court to meaningfully analyze whether the documents were in fact privileged. If the City created a timely revised log, PWC could file a motion to compel any remaining documents which PWC believed were not privileged, in accordance with the discovery statutes. A written order entered on April 4, 2017, reflected the court's ruling.

In April 2017, the City produced a revised privilege log with 1,547 entries. In May 2017, PWC served a third set of requests for production seeking all documents transmitted between LADWP and Jones's counsel before August 7, 2015. The City responded that the only responsive document was a comprehensive settlement demand from Jones protected by the settlement privilege or other privileges. The City asserted that no documents were sent by LADWP to Jones's counsel before August 7, 2015.

On July 20, 2017, the class action settlement was approved and entered as the final judgment. The class action judgment included payment of all remediation costs, as well as a total payment of $19,000,000 in attorney fees, including $15,200,000 to the attorneys for Jones and two other plaintiffs.

The City provided another revised privilege log with just 1,058 entries on September 29, 2017. Some of the documents that the City listed on the original log as privileged under the work product doctrine were reclassified and listed on the revised log as subject to attorney-client privilege, including the *Jones v. PWC* draft complaint. The description of the draft complaint stated it was created by counsel and contained "legal advice and work product concerning the claims asserted in this action." The revised log listed the comprehensive settlement demand received from Jones as protected by settlement/mediation privilege. The

7

City concluded some of the documents had been listed on the original log in error, because they were not responsive to the discovery request, so the City did not produce them.

**PWC's Second Motion to Compel Continued in Pertinent Part**

On November 3, 2017, PWC filed a second motion to compel production of documents withheld as privileged. PWC sought the *Jones v. PWC* draft complaint, the settlement demand, documents concerning ordinary business functions related to remediation, and 131 documents listed on the original privilege log that were not produced or included on the revised log.

In opposition, the City explained it had produced most of the documents at issue in the motion, including the settlement demand. The City argued that the draft complaint was protected by the attorney-client privilege and as attorney work product. In a declaration in support of the opposition, Paradis explained LADWP had requested preparation of a draft complaint alleging claims that could be brought by an LADWP ratepayer against PWC to understand this avenue of recovery. Ultimately, the City decided to pursue claims against PWC directly through the instant action, rather than indirectly, and no further action was taken on the legal theories proposed in the draft complaint.

On December 4, 2017, the trial court heard PWC's second motion to compel production of documents. One hundred fifty-five documents remained in dispute. The trial court granted the motion as to the 131 documents originally logged as privileged, but subsequently reclassified as nonresponsive after the City had lost its objection.

8

The remaining 24 documents were ones for which the City changed the basis of the privilege claim. Half of them continued to be designated as attorney work product, but the subject matter was changed to a topic other than remediation. For the other 12 documents, the City changed the privilege claim from attorney work product to attorney-client privilege, including the *Jones v. PWC* draft complaint.

In response to questioning by the court, Paradis stated that he created the draft complaint on behalf of the City. The court asked who he represented in that case. Paradis responded, "We represented the City, Your Honor." He explained that the City had requested its counsel prepare two different draft complaints: a direct complaint by the City against PWC and a complaint by Jones against PWC. Paradis stated that Jones's name was selected as the plaintiff's name on the complaint out of several people who complained to the City, and the draft was never provided to anyone other than the City.

PWC noted that Jones's attorney Landskroner submitted a fee petition in the class action showing that he was working as Jones's counsel in December 2014 when the draft pleading was prepared. At the time, Landskroner and Paradis were cocounsel in a different class action case.

The trial court was troubled that the facts were not clear and concluded that more facts were necessary to rule on discovery of the draft complaint. With the court's approval, PWC agreed to take the deposition of the person most qualified (also referred to as the PMQ) to testify about the circumstances surrounding the creation of the *Jones v. PWC* draft complaint.

The court concluded the motion to compel under discussion was effectively an extension of the prior motion to compel in

which the court ordered many of the documents produced, but had allowed the City to create a new privilege log to justify its objections that would provide for meaningful review by the court. The court did not rule on the portion of the motion concerning the *Jones v. PWC* draft complaint, taking that portion of the motion off calendar to be rescheduled after additional discovery established the foundation for the creation of the document. As to the remaining 23 documents, the court concluded that the City should have raised attorney-client privilege initially, but the reclassification of the documents complied with the overall spirit of the previous court order. The court ordered some of the documents produced, denied the motion as to some of the documents, and ordered the privilege log revised as to other documents. The court entered a written order on January 11, 2018, reflecting the ruling made on December 4, 2017.

## PWC's Motion to Compel PMQ Deposition Denied as Moot

In April 2018, PWC served a deposition notice for the person most qualified to testify regarding the *Jones v. PWC* complaint. The notice identified seven topics for testimony and sought production of several documents. The City filed a motion to quash the deposition notice for the PMQ. In May 2018, PWC filed a motion to compel compliance with the court's order to produce the person most qualified to testify about the *Jones v. PWC* draft complaint and to strike the City's motion to quash.

Several discovery motions were heard in June 2018, including the motion to compel compliance with the court's deposition order. PWC's counsel Daniel Thomasch noted that PWC had brought several successful motions to compel discovery

without seeking sanctions.  He expressed frustration, however, that the City was obstructing even the most legitimate discovery requests, court orders were not being abided, and everything required a motion to compel.  In connection with a different discovery motion, therefore, PWC sought monetary sanctions of $46,161.  The trial court found PWC's request for monetary sanctions in that matter was warranted, but awarded a reduced amount of $7,500.  The court cautioned the parties to respond fully to discovery requests without sophistry or feigned ignorance as to what the request was seeking.

With respect to PWC's motion to compel compliance with the court's order and to strike the City's motion to quash, the court stated that it had already ordered the deposition to go forward.  The court denied the motion to compel compliance as moot.  Paradis said he would withdraw the City's motion to quash, although he considered the deposition notice to be overbroad.

At a hearing in August 2018, the trial court considered two motions for monetary sanctions filed by a PWC partner, who was an individual defendant in the case, brought in connection with successful discovery motions against the City and a third party.[2] The court denied the sanctions motions without prejudice, but stated the parties could make a further request for sanctions at a later date if violations of the Discovery Act continued, noting that the court would evaluate the sanctions issue based upon the conduct of the entire discovery process in the case.

---

[2] The PWC partner and the third party are not parties on appeal.

**PWC's Motion to Compel PMQ Deposition Granted, Motion for Sanctions of $15,000 Denied Without Prejudice**

After a series of scheduling delays, on September 13, 2018, Chief Assistant City Attorney Thomas Peters appeared for deposition as the person most qualified to testify concerning the *Jones v. PWC* draft complaint. Peters produced no documents, although the City had not objected to the requests listed in the deposition notice. Peters admitted that he did not conduct any investigation or review any documents in preparation for the deposition. He had not seen the draft complaint in more than three years, did not review the entries in the privilege log, and did not look for documents responsive to the request attached to the deposition notice. Paradis instructed Peters, on the basis of privilege, not to answer questions about the decision to identify Jones as the plaintiff on the draft complaint. Peters testified that the draft complaint was a "thought experiment" to see whether ratepayers could get compensation directly from PWC and never intended to be filed. He also stated that he did not know who Jones's counsel was in January 2015 when the draft complaint was prepared. When PWC asked about the City's knowledge of the professional relationship between Paradis and Landskroner, Paradis suspended the deposition and stated that the City would seek a protective order. Several weeks later, the City filed a motion for a protective order with respect to the PMQ deposition, arguing that Peters had provided all the testimony necessary to resolve the privilege issues.

On November 2, 2018, PWC filed a motion to compel the PMQ deposition and for monetary sanctions of $15,000. PWC asserted that the City produced a witness who was completely

unprepared to testify as the PMQ, in violation of section 2025.230. The witness had conducted no investigation and reviewed no relevant documents in preparation for the deposition. As a result, the witness was unable to answer questions directly within the scope of the topics identified in the deposition notice. The City had also asserted privilege objections to foundational questions. Sanctions of $15,000 would cover a portion of PWC's cost of preparing the motion and taking the September 2018 deposition.

A hearing was held on December 5, 2018, on PWC's motion to compel the deposition and for sanctions.[3] When the trial court asked how the draft complaint came into existence, attorney Kiesel responded, "It was an evaluation that we were asked to do by the City Attorney's Office." The trial court found Peters deliberately chose not to review the relevant documents prior to his deposition so that he would not be able to answer questions about them. Peters had refused to answer questions that were not privileged, such as whether Peters or the City knew whether Jones was represented by counsel. The court expressed concern that the City ended the deposition when PWC asked about the City's knowledge of the relationship between Paradis and Landskroner.

The court was inclined to grant the motion to compel the deposition. The court added, "I'm going to defer any issue of sanctions until we conclude this issue to determine all the facts and circumstances with regard to the matters in dispute. So the motion for sanctions is denied without prejudice to bringing it

_____

[3] The reporter's transcript states Wednesday, December 6, 2018, but the parties agree that the date was Wednesday, December 5, 2018.

back after we get the final information with regard to this particular issue on privilege asserted concerning the *Jones* [*v.*] *PWC* complaint." The court continued the matter to December 12, 2018, however, to encompass the hearing scheduled on the City's motion for a protective order.

At the hearing on December 12, 2018, in connection with the motion for a protective order and the motion to compel the PMQ deposition, the trial court considered each of the document requests in the PMQ deposition notice. The notice requested a copy of the caption, signature, and service pages of the *Jones v. PWC* draft complaint. The court explained that these portions of the draft complaint were not attorney work product, because they did not include attorney impressions, conclusions, opinions, or legal research. Attorney Tufaro stated that the City was not going to produce the caption, signature, and service pages of the draft complaint.

The deposition notice requested production of all written agreements or understandings between LADWP and Antwon Jones and/or Jones's counsel prior to April 1, 2015. The court asked whether there was a relationship between Jones and the City. Tufaro said she had been instructed to assert a privilege and refused to answer. She suggested there were potential mediation privileges, although she admitted that she was not aware of case law supporting a mediation privilege for an agreement between adversaries.

The court moved to the third request for production, which sought all documents transmitted to LADWP prior to April 1, 2015, by Jones, his counsel, or otherwise on behalf of Jones individually or his putative class. The City stated it was not going to produce responsive documents based on objections of

14

overbreadth, attorney work product, mediation privilege, and potentially attorney-client privilege. The court noted, "I'm going to go through the rest of it, but I think counsel better think this through because perhaps we should reopen the settlement agreement in the class action. [¶] It appears to me from what you're telling me, there may not be an adversary relationship." PWC noted the requests sought documents from before the date that the class action was filed, while the parties were adversaries.

In the PMQ deposition, PWC had asked why Jones was selected as the named plaintiff for the draft complaint, when Jones was not represented by the City, to which the City raised a privilege objection. The court asked, "Does the City take the position that Mr. Jones was at some time represented by the City Attorney's Office? Or counsel for the City?" Tufaro responded, "No, Your Honor." The court continued, "At no time was Mr. Jones represented by counsel for the City; is that right?" Tufaro again responded, "No, Your Honor. No." PWC noted that Paradis received a lucrative contract for his law firm to serve as the administrator overseeing remediation. The City's position was that the PMQ deposition of Peters satisfied the court's order.

Attorney Kiesel later attempted to clarify the City's relationship to Jones. He stated that the city attorney's office never had any relationship with Jones. When Jones was considering filing an action against PWC, he retained the attorneys who currently represent the City as special counsel. The City's special counsel had a relationship with Jones that was not adverse to the City until Jones wanted to pursue an action against the City, at which point a conflict arose and the relationship between Jones and special counsel ended.

15

PWC's counsel objected, "Your Honor, I just want to note that we have been laboring through the four years of this case under the assumption that special counsel for the City of Los Angeles is subsumed within the definition of the City. [¶] And the notion that the City didn't do something, or the City didn't know something, but special counsel did, is one that, frankly, stuns me and means I have to go back and sort of look through the last four years of statements and communications because that is a distinction without a difference. [¶] The special counsel is special counsel to the City of Los Angeles. And they should not be able to separate themselves out from LADWP or the City [any more] than someone in the City Attorney's Office could do."

The court denied the City's motion for a protective order, granted PWC's motion to compel production of the documents requested, and overruled the City's objections on the basis of privilege. The court ordered that Peters, or an alternate witness who was the most knowledgeable, appear to answer the questions. The questions generally asked for information about the documents, the process and how the complaint was drafted. The City was entitled to continue to assert attorney-client privilege as to the contents of the draft complaint. The court described a detailed procedure for PWC to set forth the questions to be asked and the City to determine whether there was a continued objection.

PWC lodged a proposed order listing the questions for the PMQ deposition. The City sought multiple extensions of time to file objections to the proposed order, culminating in an ex parte application for a third extension, which the trial court denied. On January 17, 2019, the City objected to PWC's proposed order

and asserted a "common interest privilege" with respect to the deposition notice.

The City filed a request for permission to dismiss their contract claims against PWC, which the trial court granted, leaving the City's fraudulent inducement claims pending against PWC.

At a hearing on a different matter on January 23, 2019, PWC mentioned the parties' disputes over the questions appropriate for the PMQ witness and the documents that PWC wanted as part of that deposition. Paradis argued that prior to March 2015, the City and Jones had a common interest related to damages from the defective billing system. The court emphasized that no common interest was disclosed to the court. Paradis represented that the common interest privilege existed based on the relationship between the City and Jones, which was not adverse before the filing of the class action.

PWC argued that the period of time during which Jones had been represented by Paradis was not privileged information. Paradis said his client had directed him to refuse to allow the PMQ witness to answer whether Jones was represented by Paradis. When the court inquired who the client was, Paradis answered that the client was the City. Paradis stated that Peters directed him to assert privileges in the PMQ deposition to the question of who Paradis represented based on the attorney-client privilege, the attorney work product doctrine, and the common interest doctrine.

The court directed attorney Kiesel to find out whether the City had an internal affairs ethics department, identify the person in charge of investigating ethics issues for the City, and

17

discuss whether it would be appropriate for the City to undertake an internal investigation into what happened.

The court instructed the parties to go forward with the depositions planned and warned that the remedies of sanctions and contempt were available if the City continued to assert inappropriate objections. The court set a trial date of January 6, 2020, and final status conference for December 6, 2019.

On January 24, 2019, the trial court entered a written order reflecting the court's December 2018 rulings. The court concluded the City's objections to document requests and deposition topics had been waived. The court ordered production of a number of categories of documents, and authorized the depositions of Jones and Landskroner as well.

**Draft Complaint Produced**

On February 12, 2019, the City provided PWC with a copy of the caption and signature pages of the *Jones v. PWC* draft complaint, which listed Paradis, Tufaro, and Kiesel as the attorneys for Jones in January 2015.

PWC took Jones's deposition on February 13, 2019. Jones explained that he retained Paradis in December 2014, after submitting an online complaint to Paradis's website. He was considering filing a lawsuit against the City from the very beginning, and he believed Paradis was acting as his attorney throughout the class action. Paradis sent a copy of the *Jones v. PWC* draft complaint to Jones approximately two weeks before he sent a substantially identical version to the City.

On February 21, 2019, the trial court ordered the parties to brief several issues, including the applicability of the attorney-

18

client privilege, the work product privilege, and the crime-fraud exception, and whether the failure to disclose alleged conflicts in representation of adverse parties constituted fraud on the court.

On February 26, 2019, PWC took the deposition of Chief Deputy City Attorney James Clark, substituted by the City for Peters as the person most qualified to testify about the *Jones v. PWC* draft complaint. Clark prepared for the deposition and interviewed other attorneys, but he threw away his notes. Clark and many of the witnesses were aware before April 1, 2015, that Paradis had an attorney-client relationship with Jones. Clark also personally reviewed the *Jones v. PWC* draft complaint at that time. Initially, the City had considered entering into tolling agreements in the other lawsuits pending against the City, but the attorneys for the other plaintiffs refused to toll their claims against the City. Clark was also aware that Paradis recruited Landskroner to represent Jones. Weeks after Clark's deposition, however, Clark provided a list of 54 corrections making material changes to his testimony.

At a status conference on March 4, 2019, PWC argued the significance of the draft complaint was the unethical alliance revealed between counsel for Jones and the City prior to filing the class action. Landskroner was introduced to Jones on March 26, 2015, six days before the complaint was filed. PWC believed the settlement was effectively prearranged before the lawsuit was filed. Attorney Thomasch argued that the court, PWC, and the public had been misled by the collusive scheme, and as a result, PWC should be entitled to discovery of all matters related to the class action, the settlement agreement, and the settlement implementation. The City responded that it was no longer asserting attorney-client, work-product, or

19

mediation privileges as to the draft complaint, but was not waiving those privileges as to all communications about the class action.

The court asked Landskroner whether he paid a referral fee to Paradis. Landskroner's attorney advised him to assert his privilege against self-incrimination as to all questions about fee payments and his disclosures to the court.

The trial court restrained the City from paying any further sums to Paradis or Landskroner. The court set an order to show cause with regard to appointment of a special auditor regarding all sums previously paid to Landskroner, Paradis, or any company in which they had an interest in connection with the class action lawsuit, including the remediation effort.

On March 5, 2019, Landskroner appeared for his deposition and asserted his Fifth Amendment right against self-incrimination in response to substantive questions. On March 6, 2019, Paradis, Tufaro, and Kiesel withdrew as special counsel to the City. The City substituted in attorney Eric George and the law firm of Browne George Ross LLP as new counsel for the City.

On March 11, 2019, the City provided the full *Jones v. PWC* draft complaint to PWC.

## PWC Announces Intent to Seek Sanctions

During a status conference on March 19, 2019, PWC's counsel reported that PWC had depositions set in April for members of the city attorney's office and employees of LADWP, including Peters in his individual capacity, LADWP General Manager David Wright, LADWP Attorney Richard Tom, Assistant City Attorney Eskel Solomon, and Deputy City

Attorney Deborah Dorny.  PWC intended to depose Clark again about the corrections to his deposition, as well as depose LADWP attorneys Maribeth Annaguey and Angela Agrusa, and three former LADWP employees who received copies of the draft complaint in January 2015.  PWC intended to show that the City's special counsel met regularly with members of the city attorney's office and were not rogue actors.

Attorney Thomasch announced that PWC intended to make one or more motions, including a motion for case terminating sanctions, based on the substantive conduct of the collusive settlement and on the discovery conduct from 2017 to the present to prevent PWC from learning the truth about the settlement. Thomasch intended to file the motion by July 15, 2019, but the filing date depended on PWC's ability to obtain substantive answers.

The City noted that it had not suggested special counsel were rogue actors, and PWC was also not an independent investigator.  The City believed it still had four well-documented claims for fraudulent inducement.

PWC served a fifth set of requests for production.  In April 2019, PWC took the deposition of Paradis, who invoked his privilege against compelled self-incrimination under the federal Constitution (U.S. Const., 5th Amend., cl. 3) as to all substantive questions.  PWC also took a further deposition of Clark, who recanted additional testimony.

In April 2019, the City produced several documents responsive to prior discovery requests.  The City also produced a file titled "emails responsive to PMQ" that Kiesel had provided Peters months earlier, as well as a draft of a tolling agreement.

Over a period of five months, PWC served deposition notices for 18 percipient witnesses. In addition to the depositions above, PWC served deposition notices for Kiesel, Tufaro, Brajevich, Feuer, former class liaison attorney Michael Libman, LADWP employee Sharon Grove, and retired LADWP employees Matt Lampe and Timothy Spinn. LADWP General Manager Wright asserted his Fifth Amendment right against self-incrimination to the substantive questions posed to him.

The City objected to Kiesel's production of one document during his deposition on the ground of mediation privilege. The document was an email dated August 21, 2015, which was sent by Annaguey to other attorneys at the city attorney's office.

At a hearing on June 3, 2019, the court urged the City to complete document production in response to PWC's prior requests by June 21, 2019. The trial court appointed Edward Robbins to serve as a special master to assist the court in determining the full extent of any violations with respect to the class action and the current lawsuit.

The City raised several privilege objections during Annaguey's deposition on June 5, 2019, and the parties agreed to continue her deposition. The City provided responses and objections to PWC's sixth set of requests for production. On June 28, 2019, PWC served a notice for the deposition of former LADWP Chief Information Officer Mark Townsend, which was ultimately scheduled for dates in October 2019.

## Two Motions to Compel Documents Granted Over Mediation Privilege and Crime-fraud Objections

On July 2, 2019, PWC filed a motion to compel documents and answers to deposition questions that were withheld on the basis of mediation privilege. The City filed an opposition. At a hearing on the motion on July 25, 2019, the court described the mediation charade as being akin to a fraud on the court. The evidence in dispute resulted from a mediation that was presented to the court for approval based on collusion and misrepresentations. The court overruled the City's objection, on the ground that a legitimate mediation was prerequisite to asserting the mediation privilege. The court granted PWC's July 2, 2019 motion to compel and ordered the City to produce all documents previously withheld on the basis of a claimed mediation privilege.

The City produced the document withheld during Kiesel's deposition: an email sent by Annaguey in August 2015, which advised the City that agreeing to attorney fees "in the 7 figures" for Landskroner could be difficult to support.

On July 19, 2019, PWC filed a motion to compel documents related to the class action settlement based on Paradis's representation of Jones. The City objected on the ground of attorney-client privilege and argued the crime-fraud exception did not apply, because Paradis and Kiesel acted alone, without the City's knowledge or approval, and the City had not been aware of the extent of former special counsel's representation of Jones. At a hearing on the motion to compel on August 12, 2019, PWC asked the court to apply the crime-fraud exception and mandate production of documents, instead of the slow drip of

discovery that had been received since the City brought in new counsel.

The court found, based on the totality of the evidence, that reasonable inferences could be drawn establishing a prima facie case of fraud and the City's complicity. The documents at issue were communications between the City and its attorneys, who were involved in representing both sides in the same lawsuit with the City's knowledge and purported direction. As a result, the City's written communication with special counsel about Landskroner's settlement proposal, the sham mediation, and the charade settlement, were reasonably related to uncovering the scope of the claimed fraud. The court found all of the communications orchestrating the class action were directly related to the collusive conduct and subsequent coverup. The attorney-client privilege was waived as to the requested communications because it was axiomatic that an attorney cannot simultaneously represent two clients who are adverse to each other in related litigation without destroying the duties of confidentiality and undivided loyalty and trust owed to both clients. The court granted PWC's motion to compel and ordered the documents subject to the motion to be produced within five days. The court entered a written order consistent with the rulings at the hearing on August 27, 2019.

At a joint status conference on August 21, 2019, PWC said there had been progress on document production since the City's new counsel came into the case in March, but the progress was slow. The City represented it would substantially complete document production by August 30, 2019, along with a privilege log, and responses to requests for production. The court ordered the City to do so.

24

On August 30, 2019, the City served amended objections and responses to PWC's fifth and sixth sets of requests for production, another production of documents, and a partial privilege log, but the City acknowledged that document production was not yet complete. The parties stipulated to extend the City's deadline to produce the documents to allow City to file a writ petition. The City filed a petition for writ of mandate to vacate the August 12, 2019 order, challenging the trial court's determination that the crime-fraud exception to the attorney-client privilege applied.

PWC set dates in October 2019 to depose another LADWP employee and served a seventh set of requests for production. At a status conference on September 25, 2019, PWC sought production of the documents responsive to the trial court's July 2019 orders that were not subject to the writ, as well as to take the depositions that had been noticed, so PWC could bring its motion for case terminating and monetary sanctions. PWC's counsel was not prepared to propose a date for the sanctions motion yet, however, because PWC needed to conclude discovery for this phase.

The court set a deadline in October 2019, for the City's production of discovery in response to PWC's fifth, sixth, and seventh sets of requests for production, including a declaration that responses were complete, and all of the documents had been produced unless there were objections based on privilege, as well as a privilege log.

## Dismissal and Postdismissal Motions

On September 26, 2019, the City filed a request for dismissal of its case against PWC and others with prejudice. The dismissal was entered by the trial court on October 2, 2019. After the City notified this appellate court that the action had been dismissed with prejudice, we dismissed the City's pending petition for writ of mandate as moot.

PWC withdrew deposition notices for eight witnesses, but intended to proceed with the depositions of five witnesses related to PWC's intended sanctions motion. PWC filed an ex parte application for an order concerning PWC's right to file a motion for sanctions for misuse of the discovery process and to complete discovery related to the sanctions motion. At the hearing on the ex parte application in October 2019, attorney Thomasch explained that PWC was not moving for sanctions under section 128.5, which allows recovery of expenses incurred as a result of bad faith actions or tactics that were frivolous or solely intended to cause unnecessary delay, because the safe harbor provision would allow the City to withdraw or correct its actions. Thomasch believed section 2023.030 did not contain a safe harbor provision. The trial court allowed PWC to file its motion in order for the parties to present their arguments in a full briefing of the issues.

In November 2019, PWC filed a motion to compel discovery that had been previously ordered. PWC sought documents in response to PWC's fifth, sixth, and seventh sets of requests for production, as well as a complete privilege log and three depositions that had been noticed. PWC argued that the court

had continuing jurisdiction to order discovery in connection with the sanctions motion.

At the hearing on PWC's motion to compel in December 2019, in response to the trial court's questioning, PWC clarified that its motion for sanctions would relate solely to discovery sanctions and not sanctions for any other purpose, such as bad faith filing or inappropriate conduct during the course of a court proceeding. The court questioned the necessity of additional discovery to sanction conduct that had taken place already. PWC argued that witnesses had been untruthful, which PWC asserted was a misuse of the discovery process, and additional discovery was necessary for the court to rule on the disputed testimony. The court found it was inappropriate and unauthorized to create new litigation over discovery for the purpose of litigating a motion for discovery sanctions after dismissal of the case, and therefore, the court denied PWC's motion to compel the discovery previously ordered.

**Motion for Sanctions**

On June 29, 2020, PWC filed the motion for monetary sanctions pursuant to sections 2023.010 and 2023.030 that is at issue on appeal. The motion was based on the City's conduct that PWC argued was a misuse of the discovery process under section 2023.010 as follows: (1) asserting attorney-client and attorney work product privileges in bad faith to prevent discovery of the *Jones v. PWC* draft complaint and remediation documents that were not privileged (§ 2023.010, subd. (e)); (2) misrepresenting and concealing facts at the December 4, 2017 hearing to avoid production of the draft complaint (§ 2023.010, subds. (e), (f), (h));

27

(3) refusing to comply with the January 11, 2018 order directing production of a PMQ witness about the preparation of the draft complaint and filing a motion to quash the PMQ deposition notice (§ 2023.010, subds. (d), (e), (g), (h)); (4) giving false responses and failing to produce responsive, non-privileged documents in response to PWC's May 2, 2017 requests for documents transmitted between LADWP and Jones's counsel before August 7, 2015 (§ 2023.010, subds. (d)–(f)); (5) failing to produce responsive, non-privileged documents requested in the April 13, 2018 deposition notice for the PMQ (§ 2023.010, subds. (d), (g)); (6) providing false testimony and leaving the September 13, 2018 PMQ deposition without substantial justification (§ 2023.010, subds. (d)–(g)); (7) bringing an unsuccessful motion for a protective order without substantial justification to prevent further PMQ testimony and without trying to resolve the dispute informally (§ 2023.010, subds. (e), (h), (i)); (8) asserting a right to withhold the draft complaint under a "common interest privilege" (§ 2023.010, subds. (e), (f), (h)); (9) failing to produce relevant documents from Peters' computer hard drive (§ 2023.010, subds. (d), (g)); (10) spoliating evidence through Clark's destruction of handwritten notes of interviews he conducted to prepare for his PMQ deposition (§ 2023.010, subds. (d), (g)); and (11) testifying evasively or falsely about the City's knowledge of the collusive nature of the class action (§ 2023.010, subd. (f)).

PWC sought to recover attorney fees in three categories: fees incurred in connection with PWC's efforts to compel production of the draft complaint and to obtain information surrounding the drafting; fees resulting from the City's attempts to cover up knowledge of and participation in the class action fraud; and fees to prepare the motion for sanctions itself. The

28

tasks performed included: investigating facts; researching, preparing, and arguing six successful motions to compel; preparing briefs and attending court proceedings in connection with 10 other filings related to discovery disputes; reviewing the City's document productions and privilege logs; preparing for and taking 23 depositions; addressing discovery issues related to the draft complaint in 12 status reports; preparing, propounding, reviewing and responding to discovery requests; and preparing the comprehensive sanctions motion.

PWC asserted that the court had authority to award monetary sanctions under section 2023.030 and the court's inherent power. PWC requested a "baseline amount" of $8,002,412 as monetary sanctions. The total incorporated attorney fees of $7,857,017.98, including $792,579 to prepare and file the motion for sanctions, and related expenses. In addition, PWC suggested it would be an appropriate exercise of the court's inherent power to increase the amount of the monetary sanction for fees and costs by $1,000,000 or more due to the egregious nature of the City's discovery abuse. PWC stated that the City's misconduct had been largely litigated and established through the prior motion practice.

The attorney time records submitted in support of the sanctions motion commingled fees that PWC incurred in connection with its effort to obtain discovery with fees incurred in connection with PWC's investigation of the class action fraud, assessment of the documents produced, and litigation strategies. The first entry was for attorney fees of $1,203.60 incurred on January 20, 2017, to review the City's initial privilege log. More than 4,000 separate entries were categorized as discovery motions, depositions, fact investigation, appellate motions, other

written motions, preparation for and appearances at status conferences, analysis/strategy, and other tasks. PWC's counsel stated these entries included 5,000 hours of work to investigate the City's knowledge of, and participation in, the class action fraud at a cost to PWC of $4,259,529.14. The work included, for example, counsel's investigation of the LADWP Board's activity related to the class action fraud, investigation of the class action settlement and remediation, legal research relating to possible intervention in the class action, preparation and attendance at hearings for the appointment of new counsel for Jones, attendance at Los Angeles City Council meetings concerning the class action fraud and preparation of debriefing about the meetings, and review of the new class counsel's report on the state of the class action settlement.

## Opposition to Motion for Sanctions

In August 2020, the City filed an opposition to the motion for monetary sanctions. The City argued that the court lacked jurisdiction to hear the motion because the action had been dismissed with prejudice. The motion was also untimely, because PWC waited years following the discovery abuse at issue to file the motion. Timely sanctions motions were required to make sanctions effective, and the issues for which sanctions were being sought had long been concluded.

The City also argued that the court did not have inherent authority to award monetary sanctions; there must be a statutory or contractual basis to award monetary discovery sanctions. The court's authority to award sanctions could be exercised only within the statutory framework authorizing monetary sanctions.

PWC's motion demonstrated a fundamental misunderstanding of the sanctions that may be awarded pursuant to sections 2023.010 and 2023.030 by seeking monetary sanctions that could never be granted under the Discovery Act. Even if there was underlying authority to issue monetary sanctions in this case, the sanctions were limited to expenses incurred to compel a party to submit to discovery, and there was no statutory authority to add a penalty that exceeded the amount incurred by PWC. The Discovery Act permitted monetary sanctions to remedy discovery abuse, not to punish the offending party.

The City also contended the amount sought was unreasonable. The laundry list of conduct raised by PWC in the motion was not sanctionable discovery abuse. PWC had failed to distinguish between fees incurred as a result of the misuse of discovery and fees incurred in PWC's self-motivated, voluntary effort to investigate purported fraud in the class action lawsuit. PWC sought to recover fees for motions that were granted only in part, and fees that were not incurred "as a result of" purported discovery abuse.

For example, PWC was not required to take 18 depositions to challenge Clark's corrections to his deposition testimony. PWC had failed to explain how individual depositions were required as a result of Clark's conduct. Instead, the City argued, PWC pursued substantial discovery because the information was relevant to the merits of the case, to the potential damages that the City sought, and to the sanctions motion that PWC intended to bring. PWC's effort to make class members whole did not correlate to sanctionable discovery abuse, nor justify attorney fee shifting.

The City asserted that it had been substantially justified in asserting the mediation privilege, attorney-client privilege, and attorney work product protection. The City sought an award of monetary sanctions in the amount of $147,036.50 to oppose PWC's motion.

**Reply**

In September 2020, PWC filed a reply. PWC argued that the court had jurisdiction to hear the motion for sanctions as a collateral matter and there was no bright line rule governing timeliness. Moreover, any delay had not prejudiced the City. PWC characterized the trial court's prior statements about sanctions as an instruction to reserve sanctions issues until the end of discovery. PWC called upon the court to exercise its supervisory powers over the parties to compensate PWC for years of discovery and motion practice that resulted from the City's misconduct. The size of the sanctions award was within the reasonable discretion of the trial court and the expenses sought were reasonable in amount, including travel and lodging costs that the court had taxed previously. The attached attorney declaration noted the disruption caused by the COVID-19 pandemic, beginning with the closure of the California courts in May 2020 and the beginning of virtual proceedings on June 22, 2020. PWC requested an additional $357,403.70 in attorney fees as monetary sanctions in connection with the reply brief, but also made a minor adjustment to amount in the original motion. As a result, the total amount of "baseline costs" that PWC sought to recover as a sanction was $8,356,852.

## Hearing and Trial Court Ruling Awarding Sanctions

At the hearing on PWC's motion for sanctions on October 6, 2020, PWC argued the misuse of discovery arose from the City's effort to resist production of the *Jones v. PWC* draft complaint and to prevent discovery about the circumstances surrounding the class action lawsuit. PWC had suspected collusion between the City and Jones's counsel early in the litigation based on a number of factors: (1) Landskroner's prior relationship with Paradis; (2) the City's settlement of the class action without answering the complaint; (3) the agreement to pay excessive attorney fees when no discovery was conducted; and (4) the terms of the settlement, which simply obligated the City to take actions that it had already promised to take.

PWC noted that if the City had answered questions truthfully at the December 4, 2017 hearing, the court would have ordered the draft complaint produced. Ten of the depositions that PWC took after March 4, 2019, were of attorneys questioned solely about the draft complaint. PWC emphasized the benefit to the public that resulted from PWC's persistent efforts to obtain discovery, at a high cost to PWC, which should have been provided voluntarily. The City had no justification for obstruction, let alone substantial justification.

PWC argued that the motion was timely, because the court and the City knew PWC planned to file a motion for sanctions once the discovery issues were resolved, which occurred when the court denied further discovery in December 2019. The draft took time to compile because the discovery misconduct was so pervasive. PWC's counsel argued that a litigant who stonewalled discovery should not be absolved of consequences because of a

delay of several months in bringing a motion for sanctions, particularly during a pandemic, when an earlier filing date would have changed nothing.

The City argued that the motion for sanctions was profoundly untimely and the court had no jurisdiction to rule on the motion after dismissal of the action with prejudice. The City's counsel expressed disbelief at PWC's decision to spend $1 million in attorney fees to prepare and bring a single motion for discovery sanctions. The City emphasized that courts have no inherent power to impose monetary sanctions for misconduct without statutory authority. Case law allowing sanctions motions to be heard after dismissal of the action as a collateral proceeding applied to punishment for bad faith tactics under other statutory provisions. The sanctions incorporated in the discovery statutes were intended to remedy discovery abuse, not punish the offending party. The conditions created by the pandemic were not an excuse in this case.

PWC noted that there was no deadline to bring the motion in the statute, no deadline had been imposed by the court, and there was no prejudice as a result of the date of the filing. The City had established no substantial justification and the fees were reasonable.

The trial court concluded that it retained jurisdiction to determine a postdismissal motion for sanctions under the Discovery Act as a collateral statutory right. The court noted that a judge has broad discretion to impose monetary sanctions against anyone who has misused the discovery process, citing *Department of Forestry & Fire Protection v. Howell* (2017) 18 Cal.App.5th 154 (*Howell*), disapproved on another ground in *Presbyterian Camp & Conference Centers, Inc. v. Superior Court*

(2021) 12 Cal.5th 493, 516, footnote 17. The court listed misuses of the discovery process set forth in section 2023.010 and relied on the court's authority to impose sanctions under section 2023.030. The court noted case law stating that the power to impose sanctions under the Discovery Act supplemented, but did not supplant, the court's inherent power to deal with litigation abuse, citing *Padron v. Watchtower Bible & Tract Society of New York, Inc.* (2017) 16 Cal.App.5th 1246 (*Padron*).

In the court's view, PWC was seeking sanctions for three categories of conduct. First, PWC sought $2,801,946.49 for attorney fees incurred in connection with the effort to compel production of the *Jones v. PWC* draft complaint and information surrounding drafting of the complaint. Second, PWC sought $4,259,529.14 for attorney fees resulting from the City's attempt to cover up the extent of its knowledge and participation in the potential class action fraud. Third, PWC sought $1,149,907.90 for attorney fees incurred in connection with the motion for sanctions itself and associated expenses.

The court recited the timeline of circumstances and events related to discovery that PWC had presented to support the motion for sanctions, beginning with the City's submission of its first privilege log on January 20, 2017. The timeline included PWC's February 2017 motion to compel, which the court granted in part on March 6, 2017, and the City's attempts to resist production of the draft complaint through privilege claims. The court noted the City responded to PWC's third set of requests for production by saying only one responsive document existed, but several more documents were later produced. The timeline included the City's failure to explain the attorney-client relationship between Paradis and Jones to the court, PWC's

35

actions to learn the circumstances surrounding the draft complaint through a PMQ deposition, and the City's actions to resist providing the information. The court mentioned the court-ordered depositions of Landskroner, Jones, and Paradis. The timeline of events also included Clark's errata to his March 14, 2019, PMQ deposition testimony and his subsequent deposition dates, in which Clark changed his testimony, as well as other depositions taken following the PMQ deposition. The timeline included PWC's motions to compel documents withheld on the basis of privilege that were granted on July 25 and August 12, 2019. On September 26, 2019, the City voluntarily dismissed the complaint against PWC with prejudice, preventing production of the documents covered by the recent orders, and on June 29, 2020, PWC filed the instant motion for sanctions, which the City opposed.

The trial court found there had been a serious abuse of discovery by the City and its counsel. The court's ruling was expressly based on all of the evidence in the court files, the briefs, the evidence supplied by the parties, and the totality of the circumstances in the case. The court concluded that PWC was required to expend substantial hours because of the City's misuse of the discovery process, which PWC stated totaled more than 9,405 hours. The court found that the serious abuse of discovery merited considerable sanctions. Based on the court's consideration of all the evidence and the totality of the circumstances, the court granted the motion for sanctions and awarded sanctions against the City in the amount of $2,500,000. The court's order did not allocate amounts to different categories, nor explain what the total amount included or excluded.

On November 10, 2020, the trial court entered a written order granting PWC's motion for monetary sanctions in accord with its ruling on October 6, 2020. The City filed a timely notice of appeal from the order awarding sanctions. This appellate court sent a letter pursuant to Government Code section 68081 providing the parties with an opportunity to present their views on whether the trial court had authority to impose sanctions pursuant solely to section 2023.010, section 2023.030, or both.[4]

## DISCUSSION

### Standard of Review

"We review an order imposing discovery sanctions under the abuse of discretion standard. [Citation.] An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.] The abuse of discretion standard affords considerable deference to the trial court, provided that the court acted in accordance with the governing rules of law." (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1422 (*New Albertsons*).) "We recognize that our review of the trial court's sanctions award is deferential, but we must ensure the trial court has followed the applicable statute." (*Kwan*

---

[4] On February 1, 2022, PWC filed a request that this appellate court take judicial notice of criminal plea agreements entered into by Paradis, Peters, and Wright with the United States Attorney's Office. The request for judicial notice is denied, as the plea agreements are not relevant to the issues on appeal.

37

*Software Engineering, Inc. v. Hennings* (2020) 58 Cal.App.5th 57, 76 (*Kwan*).) "A decision 'that transgresses the confines of the applicable principles of law is outside the scope of discretion' and is an abuse of discretion. [Citation.]" (*New Albertsons*, *supra*, 168 Cal.App.4th at p. 1422.)

"Statutory interpretation involves purely legal questions to which we apply the independent standard of review. [Citation.] Thus, 'where the propriety of a discovery order turns on statutory interpretation, an appellate court may determine the issue de novo as a question of law. [Citation.]' [Citation.]" (*Haniff v. Superior Court* (2017) 9 Cal.App.5th 191, 198.)

"[O]ur fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute. [Citation.] We begin with the language of the statute, giving the words their usual and ordinary meaning. [Citation.] The language must be construed 'in the context of the statute as a whole and the overall statutory scheme, and we give "significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' [Citation.]" (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.)

"In other words, ' "we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" ' [Citation.] If the statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a

construction that would lead to absurd consequences.  [Citation.]"
(*Smith v. Superior Court*, *supra*, 39 Cal.4th at p. 83.)

## Monetary Sanctions for Misuse of the Discovery Process

PWC brought its motion for monetary sanctions under
sections 2023.010 and 2023.030 of the Discovery Act.  We
conclude that these definitional statutes, standing alone or read
together, do not authorize the court to impose sanctions in a
particular case.

### A.  General Statutory Scheme

The Discovery Act provides a self-executing process for
litigants to obtain broad discovery with a minimum of judicial
intervention.  (*Sinaiko v. Healthcare Consulting, Inc. v. Pacific
Healthcare Consultants* (2007) 148 Cal.App.4th 390, 402.)  To
accomplish this exchange, the Discovery Act sets forth six
methods of civil discovery in different chapters:  depositions,
interrogatories, inspections, medical examinations, requests for
admission, and exchanges of expert witness information.
(§ 2019.010.)

Each discovery method authorizes the court to impose
specific types of sanctions under specific circumstances.  When a
discovery motion is filed, the statute governing the motion
generally requires that the court impose a monetary sanction
against a party, person, or attorney who unsuccessfully made or
opposed the motion, unless the person subject to the sanction
acted with substantial justification or sanctions would be unjust
under the circumstances.  (*New Albertsons*, *supra*,

39

168 Cal.App.4th at p. 1423.) "The statutes state that the court may impose an issue, evidence, or terminating sanction, however, only if a party fails to obey a court order compelling discovery." (*Ibid*.)

As a relevant example, the inspections chapter allows a party to demand the production of documents. (§ 2031.010, subd. (b).) The party subject to the demand may file a motion for a protective order under section 2031.060, and the statute directs the court to impose a monetary sanction under the sanctions chapter against the unsuccessful party, person, or attorney unless the party acted with substantial justification or sanctions would be unjust. (§ 2031.060, subds. (a), (b), (h).) If a party fails to serve a timely response to a demand for inspection, the party making the demand may file a motion to compel a response to the demand. (§ 2031.300, subd. (b).) Under section 2031.300, the court is explicitly required to impose a monetary sanction against an unsuccessful party, person, or attorney acting without substantial justification in connection with a motion to compel a response, and if a party fails to obey an order compelling a response the court may impose an issue, evidence, or terminating sanction under the sanctions chapter. (§ 2031.300, subd. (c).)[5]

---

[5] Section 2031.300, subdivision (c), states in full: "[With the exception of electronically stored information under certain circumstances,] the court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to compel a response to a demand for inspection, copying, testing, or sampling, unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust. If a party then fails to obey the order compelling a response, the court

In addition to the chapters governing specific discovery methods, there are other provisions of the Discovery Act that expressly authorize the court to impose certain types of sanctions. (See, e.g., § 2019.030 [court must impose monetary sanctions under the sanctions chapter against party who unsuccessfully files or opposes motion for protective order arguing discovery is duplicative, burdensome, or expensive, unless party acted with substantial justification or sanctions would be unjust under the circumstances]; § 2023.020 [court must impose monetary sanction against any party or attorney who fails to confer as required].)

"The trial court cannot impose sanctions for misuse of the discovery process as a punishment. [Citation.] [¶] The discovery statutes evince an incremental approach to discovery sanctions, starting with monetary sanctions and ending with the ultimate sanction of termination. 'Discovery sanctions "should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery." ' [Citation.] If a lesser sanction fails to curb misuse, a greater sanction is warranted: continuing misuses of the discovery process warrant incrementally harsher sanctions until the sanction is reached that will curb the abuse. 'A decision to order terminating sanctions should not be made lightly. But where a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce

---

may make those orders that are just, including the imposition of an issue sanction, an evidence sanction, or a terminating sanction under Chapter 7 (commencing with Section 2023.010). In lieu of or in addition to this sanction, the court may impose a monetary sanction under Chapter 7 (commencing with Section 2023.010)." (§ 2031.300, subd. (c).)

compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction.' (*Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262, 279–280.)" (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 992, fn. omitted.)

" 'Discovery sanctions are intended to remedy discovery abuse, not to punish the offending party.  Accordingly, sanctions should be tailored to serve that remedial purpose, should not put the moving party in a better position than he would otherwise have been had he obtained the requested discovery, and should be proportionate to the offending party's misconduct.' (*Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1223.)" (*Padron, supra*, 16 Cal.App.5th at pp. 1259–1260.)

### B.  Section 2023.010

Section 2023.010 describes general categories of discovery misconduct, but does not contain any language that authorizes the court to impose sanctions for the conduct listed.  Section 2023.010 states in full:  "Misuses of the discovery process include, but are not limited to, the following:  [¶]  (a) Persisting, over objection and without substantial justification, in an attempt to obtain information or materials that are outside the scope of permissible discovery.  [¶]  (b) Using a discovery method in a manner that does not comply with its specified procedures.  [¶] (c) Employing a discovery method in a manner or to an extent that causes unwarranted annoyance, embarrassment, or oppression, or undue burden and expense.  [¶]  (d) Failing to respond or to submit to an authorized method of discovery.  [¶] (e) Making, without substantial justification, an unmeritorious

42

objection to discovery.  [¶]  (f) Making an evasive response to discovery.  [¶]  (g) Disobeying a court order to provide discovery.  [¶]  (h) Making or opposing, unsuccessfully and without substantial justification, a motion to compel or to limit discovery.  [¶]  (i) Failing to confer in person, by telephone, or by letter with an opposing party or attorney in a reasonable and good faith attempt to resolve informally any dispute concerning discovery, if the section governing a particular discovery motion requires the filing of a declaration stating facts showing that an attempt at informal resolution has been made."  (§ 2023.010.)

Unlike provisions of the Discovery Act which expressly direct the court to impose specific types of sanctions under specific circumstances, there is no language in section 2023.010 stating that the court may impose a sanction under chapter 7 or stating the type of sanction to impose.  It is clear that the Legislature knows how to enact statutes that authorize the court to impose sanctions under chapter 7 of the Discovery Act.  (See, i.e., § 2031.300, subd. (c).)  If the Legislature intended for the court to impose sanctions for misuse of the discovery process based directly on the provisions of section 2023.010, they knew how to write section 2023.010 to authorize sanctions under section 2023.030.

Instead, each of the categories of misconduct listed in section 2023.010 are managed through the procedures set forth in the chapters governing the discovery methods, as well as the other provisions of the Discovery Act that regulate and sanction misconduct.  For example, the types of misconduct listed in section 2023.010, subdivisions (a), (b), and (c), which concern misuse of the discovery methods in ways that are overly burdensome or for which they were not designed, are addressed

43

through statutes providing for protective orders and sanctions (see, i.e., §§ 2019.030, 2025.420, subds. (a), (b)).  Failing to respond to discovery requests (§ 2023.010, subd. (d)) and providing evasive responses (§ 2023.010, subd. (f)) are regulated and sanctioned under the chapters governing the different discovery methods, such as the chapter addressing inspection demands, which provides for motions to compel a response when a party fails to respond (§ 2031.300, subd. (b)) and to compel a further response (§ 2031.310, subd. (h)), as well as for the court to impose a monetary sanction against the party who unsuccessfully opposed a motion to compel without substantial justification.  Sanctions for making an unmeritorious objection (§ 2023.010, subd. (e)) are authorized in the chapters governing the discovery methods as well, such as the chapter governing oral depositions, which directs the court to sanction a party who unsuccessfully and without substantial justification files a motion to quash a deposition notice (§ 2025.410, subds. (c), (e)).  Provisions of the Discovery Act authorize specific sanctions when a party unsuccessfully makes or opposes a motion to compel discovery without substantial justification (§ 2023.010, subd. (h)) or disobeys a court order to provide discovery (§ 2023.010, subd. (g)).  (See, i.e., § 2031.300, subd. (c).)  Sanctions for failing to confer (§ 2023.010, subd. (h)) are expressly provided for in section 2023.020.  To interpret section 2023.010 as authorizing the court to impose sanctions for the categories of discovery misconduct listed would make the carefully constructed sanctions provisions of the chapters governing the discovery methods superfluous.

The leading treatise on California discovery law, coauthored by Professor James Hogan, who was the Reporter for the commission that drafted the Discovery Act, states that the

44

Legislature emphasized its concern about the misuse of discovery that had developed by cataloguing different types of misuse in section 2023.010.  (2 Hogan & Weber, Cal. Civil Discovery (2 ed. 2005) Sanctions, § 15.1 (2 Hogan & Weber).)  Professor Hogan explains, "This subdivision is essentially a statutory preamble or policy statement identifying generally the classes of undesirable conduct that prompted the 1986 revision of California's civil discovery system.  It alerts litigants to the Legislature's deep-seated concern that they do not undermine the goals of civil discovery by practices detrimental to its proper operation." (*Ibid*.)  The catalogue of discovery misuse in section 2023.010 adds nothing substantive to the Discovery Act.  (*Ibid*.)[6]  "The individual sections of the Act regulating the six methods of

---

[6] Professor Hogan mentions one exception.  (2 Hogan & Weber, *supra*, § 15.1.)  When originally enacted in 1986, former section 2023, subdivision (a), contained the catalog of discovery misuse, and former section 2023, subdivision (b), provided the types of sanctions available.  (Former § 2023.)  As originally enacted, former section 2023, subdivision (a)(7), expressly stated that the trial court may impose a monetary sanction under section 2023 against any party who failed to confer as required. (Former § 2023, subd. (a)(7).)  The Legislature adopted minor amendments to clean up the Discovery Act before the operative date of the provisions (Stats. 1987, ch. 86, § 6, enacted July 2, 1987, operative July 1, 1987), and later reorganized former section 2023 into three new statutes, effective July 1, 2005, without substantive change. (Recommendation:  Civil Discovery: Nonsubstantive Reform (Sept. 2003) 33 Cal. Law Revision Com. Rep. (2003) pp. 809, 835–838.)  The provision of former section 2023 authorizing the trial court to impose a monetary sanction for failing to confer is now contained in section 2023.020, and as a result, none of the subdivisions of section 2023.010 expressly authorize the trial court to impose a sanction of any type.

discovery contain the provisions that aim to eliminate or ameliorate the listed abuses.  Trial courts should look to these provisions, and not to Section 2023.010, when a party brings any particular discovery misuse or abuse to its attention." (*Ibid.*, fn. omitted.)

## C.  Section 2023.030

Section 2023.030 describes the types of sanctions available under the Discovery Act when another provision authorizes a particular sanction.  Section 2023.030 does not independently authorize the court to impose sanctions for discovery misconduct.

Section 2023.030 provides in full:  "To the extent authorized by the chapter governing any particular discovery method or any other provision of this title, the court, after notice to any affected party, person, or attorney, and after opportunity for hearing, may impose the following sanctions against anyone engaging in conduct that is a misuse of the discovery process:  [¶] (a) The court may impose a monetary sanction ordering that one engaging in the misuse of the discovery process, or any attorney advising that conduct, or both pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct.  The court may also impose this sanction on one unsuccessfully asserting that another has engaged in the misuse of the discovery process, or on any attorney who advised that assertion, or on both.  If a monetary sanction is authorized by any provision of this title, the court shall impose that sanction unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.  [¶]  (b) The court may impose an issue

46

sanction ordering that designated facts shall be taken as established in the action in accordance with the claim of the party adversely affected by the misuse of the discovery process. The court may also impose an issue sanction by an order prohibiting any party engaging in the misuse of the discovery process from supporting or opposing designated claims or defenses.  [¶]  (c) The court may impose an evidence sanction by an order prohibiting any party engaging in the misuse of the discovery process from introducing designated matters in evidence.  [¶]  (d) The court may impose a terminating sanction by one of the following orders:  [¶]  (1) An order striking out the pleadings or parts of the pleadings of any party engaging in the misuse of the discovery process.  [¶]  (2) An order staying further proceedings by that party until an order for discovery is obeyed.  [¶]  (3) An order dismissing the action, or any part of the action, of that party.  [¶]  (4) An order rendering a judgment by default against that party.  [¶]  (e) The court may impose a contempt sanction by an order treating the misuse of the discovery process as a contempt of court.  [¶]  (f)(1) Notwithstanding subdivision (a), or any other section of this title, absent exceptional circumstances, the court shall not impose sanctions on a party or any attorney of a party for failure to provide electronically stored information that has been lost, damaged, altered, or overwritten as the result of the routine, good faith operation of an electronic information system.  [¶]  (2) This subdivision shall not be construed to alter any obligation to preserve discoverable information." (§ 2023.030.)

The plain language of the statute requires sanctions under section 2023.030 to be authorized by another provision of the Discovery Act.  Other courts have interpreted the statutory

47

language to mean that sanctions are available under section 2023.030 to the extent they are authorized by another provision of the Discovery Act.  (See, i.e., *New Albertsons*, *supra*, 168 Cal.App.4th at p. 1408 [availability of nonmonetary sanctions without court order compelling discovery]; *London v. Dri-Honing Corp.* (2004) 117 Cal.App.4th 999, 1005 (*London*) [concluding "to the extent authorized" refers to authorization by particular discovery chapter to impose certain type of sanction, but does not extend to procedural requirements for filing a timely motion]; *Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1114 (*Zellerino*) [former § 2023, subd. (b), current § 2023.030, limits permissible sanctions to those authorized by section governing any particular discovery method].)

As the court concluded in *New Albertsons*, *supra*, 168 Cal.App.4th at pages 1422 to 1423:  "Section 2023.030 authorizes a court to impose the specified types of sanctions, '[t]o the extent authorized by the chapter governing any particular discovery method or any other provision of this title.'  [Citation.]  This means that the statutes governing the particular discovery methods limit the permissible sanctions to those sanctions provided under the applicable governing statutes.  (*London*[, *supra*, 117 Cal.App.4th at pp. 1005–1006] [applying former § 2023, subd. (b)]; *Zellerino*[, *supra*, 235 Cal.App.3d at p. 1114] [same]; *Ruvalcaba v. Government Employees Ins. Co.* (1990) 222 Cal.App.3d 1579, 1581–1583 (*Ruvalcaba*) [same]; see 2 Hogan & Weber, Cal. Civil Discovery (2d ed. 2005) Sanctions, §§ 15.1, 15.2 & 15.5, pp. 15–1 to 15–3, 15–15 to 15–17.)"

Professor Hogan adds in his treatise, "The most cursory examination of Section 2023.030 reveals that it is only a lexicon. It principally names and defines the adjectives, 'monetary,'

48

'issue,' 'evidence,' 'terminating' and 'contempt,' that the Act uses elsewhere to describe the specific sanctions available for any particular discovery abuse. Indeed, Section 2023.030 states that a court may impose any of the sanctions it defines only '[t]o the extent authorized by the section governing any particular discovery method.' " (2 Hogan & Weber, *supra*, § 15.2.) Section 2023.030 "names and defines the various sanctions that might be available for misuse of discovery. Then, in the individual statutes that regulate each discovery device, it specifies which of those sanctions are available for specific misuses of that device." (*Ibid.*, fn. omitted.) "Ordinarily, the Civil Discovery Act locates the sanctions that the court may impose for a specific misuse of a certain discovery device in the same statute that regulates that discovery device. For example, the Act does not merely regulate interrogatories; it also details the procedures to follow and the sanctions available if the responding party answers the interrogatories inadequately or not at all." (*Ibid.*, fn. omitted.)

### D. Application to the Present Case

Based on the plain language of the statutes discussed above, we conclude that sections 2023.010 and 2023.030 do not independently authorize the trial court to impose monetary sanctions for misuse of discovery. The award of monetary sanctions in this case, which was based solely on sections 2023.010 and 2023.030 without regard to any other provision of the Discovery Act, constituted an abuse of discretion because it was outside the bounds of the court's statutory authority.

We recognize that the timeline of circumstances and events recited by the trial court included discovery proceedings for which

49

monetary sanctions were authorized, but we cannot presume the trial court tailored its award to expenses resulting from sanctionable conduct.  The sanctions motion relied solely on sections 2023.010 and 2023.030, without identifying any underlying discovery statutes that authorized monetary sanctions.  PWC sought expenses resulting from violations of the categories set forth in section 2023.010, rather than listing expenses incurred as a result of sanctionable conduct under a discovery provision other than 2023.010 or 2023.030.  The trial court relied on case law cited by PWC, discussed further below, which did not address the statutory language of section 2023.030 requiring sanctions to be authorized by another discovery provision.  And the trial court expressly based its award on all of the evidence, the briefs, and the totality of the circumstances presented in the case, rather than on conduct sanctionable under discovery provisions other than sections 2023.010 and 2023.030.

We also cannot conclude that the amount awarded was an appropriate exercise of the court's discretion with respect to the underlying discovery provisions authorizing monetary sanctions, because PWC presented its expenses based on violations of section 2023.010.  As one example, PWC sought attorney fees incurred to review the City's initial privilege log, because the City listed documents in bad faith that were not privileged, in violation of section 2023.010, subdivision (e).  Under the discovery statutes, however, a propounding party who deems an objection to be without merit may bring a motion to compel further response under section 2031.310, subdivision (a)(3).  The court is required to impose a monetary sanction under section 2031.310, subdivision (h) against a party who unsuccessfully opposes the motion in the amount of the reasonable expenses

50

incurred as a result of the sanctionable conduct. Because the motion was presented based on violations of section 2023.010, PWC listed substantial expenses that appear unrelated to sanctionable discovery conduct under other provisions, such as attorney fees incurred for independent factual investigation, or to attend city council meetings, or to take depositions in an attempt to prove the substantive testimony of another witness was false.

We recognize that the statutory language of section 2023.030 limiting sanctions "to the extent authorized" by other provisions of the Discovery Act was not addressed in the trial court, and no prior case law squarely held that section 2023.030 requires monetary sanctions to be authorized by another provision of the Discovery Act. As a result, we conclude the order in this case must be reversed and remanded to allow PWC an opportunity to present the issue of sanctions to the trial court for determination under the law as clarified. Our conclusion that the sanctions order must be reversed, and any award of sanctions must be made in conformance with the requirements of the Discovery Act, is not intended to absolve the City of the serious and egregious nature of the conduct at issue; we take no position as to the amount of monetary sanctions that would be appropriate for the trial court to assess on remand.

## E. Cases Relied on by PWC are Distinguishable

PWC relies on several cases to support its position that sanctions may be imposed directly under sections 2023.010 and 2023.030 without regard to any other provision of the Discovery Act. None of the cases relied on by PWC, however, consider the statutory language of section 2023.030 that limits sanctions "to

the extent authorized by" another provision of the Discovery Act. In addition, all of the cases cited by PWC are distinguishable in meaningful ways.

### 1. Cases in which Authorization was not at Issue

Some cases, in summarizing the general statutory scheme governing discovery sanctions or determining whether sanctions may be imposed under section 2023.030 in a particular case, fail to mention the portion of the statutory language limiting sanctions to those authorized by another provision of the Discovery Act. (See, i.e., *Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 390.) In these cases, however, the facts reflect that sanctions were authorized by a discovery provision other than sections 2023.010 and 2023.030, and the court's authorization to impose sanctions was not at issue. (See, i.e., *Pratt v. Union Pacific Railroad Co.* (2008) 168 Cal.App.4th 165, 182–184 (*Pratt*) [trial court granted preliminary injunction, which appellate court deemed a protective order under discovery statutes; appellate court's discussion of monetary sanctions referred solely to §§ 2023.010 and 2023.030, but we note § 2019.030 authorizes court to impose monetary sanctions against party who unsuccessfully opposes protective order without substantial justification]; *Clement v. Alegre* (2009) 177 Cal.App.4th 1277, 1284 (*Clement*) [order compelling further answers under §§ 2030.300 and 2023.010 supported monetary sanctions of $6,632.50]; *Howell, supra,* 18 Cal.App.5th at pp. 166, 184–195 [monetary and terminating sanctions were justified by plaintiff's misuse of discovery process, including willful violation of court orders to produce documents, spoliation of evidence, and

52

denials of requests for admission that allowed defendants to recover cost-of-proof expenses, but amount of monetary sanctions had to be limited to fees and expenses incurred as a result of discovery abuse]; *Ellis v. Toshiba* (2013) 218 Cal.App.4th 853, 877–881 (*Ellis*) [monetary sanctions awarded for discovery abuse, including violation of court orders to provide discovery and failing to meet and confer]; see also *Mileikowsky v. Tenet Healthsystem*, *supra*, 128 Cal.App.4th at p. 262 [stipulation that defendant could seek terminating sanction if plaintiff failed to produce discovery was deemed equivalent to court order, satisfying requirement before imposing terminating sanction].)

"It is axiomatic that cases are not authority for propositions that are not considered." (*The California Gun Rights Foundation v. Superior Court* (2020) 49 Cal.App.5th 777, 792.) To the extent language in *Pratt*, *Clement*, *Howell,* or *Ellis* could be construed to mean that courts may impose monetary sanctions based solely on the provisions of sections 2023.010 or 2023.030, or both, without regard to whether sanctions are authorized by another provision of the Discovery Act, we respectfully disagree.

### 2. Cases Allowing Imposition of Statutory Discovery Sanctions Without Requiring Compliance with Requirements

PWC relies on several other cases to support its conclusion that sanctions may be awarded directly under section 2023.030, without resort to other provisions of the Discovery Act. We conclude these cases stand for a different proposition that is consistent with the statutory scheme: in exceptional circumstances, when a prerequisite to imposing sanctions under

53

a particular discovery method, such as filing a motion to compel, is impossible, futile, or an idle act, the court may excuse compliance with the requirement and fashion a remedy from the sanctions authorized by the discovery chapter.  To the extent that the courts in these cases relied solely on sections 2023.010 and 2023.030 for the authority to impose sanctions, however, we disagree.  The cases cited by PWC generally address three types of egregious circumstances, none of which are present in the current case.

### a.  False Answer Concealing the Existence of Discoverable Information

A responding party's false answer in discovery that conceals the existence of discoverable information may excuse the propounding party from compliance with a prerequisite to obtain sanctions under a provision of the Discovery Act.  (See, i.e., *Pate v. Channel Lumber Co.* (1997) 51 Cal.App.4th 1447, 1455–1456 (*Pate*) [after defendant's repeated assurances that all responsive documents were produced, plaintiff had no reason to file motion to compel further responses; when defendant attempted to introduce documents at trial that were not disclosed, no prior order compelling discovery was required before imposing evidence sanction under former § 2031, subd. (*l*)]; *Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1155–1163 (*Sherman*) [one week after jury verdict for defendant, plaintiffs learned defendant failed to produce 21 incident reports responsive to discovery requests; appellate court ordered new trial and monetary sanctions sufficient to cover plaintiffs' costs for first trial that would be redone, noting plaintiffs could not

54

have moved to compel production of documents they did not know existed and could not have sought sanctions until they discovered defendant's responses were inadequate or evasive]; *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1545–1546 (*Vallbona*) [motion to compel response would have been futile, because defendants said documents requested had been stolen; when defendants attempted to introduce the documents at trial, a prior order compelling discovery was not required before imposing evidence and issue sanctions under authority of former § 2031, subd. (k)].)  In these cases, the responding party's false answer concealed the existence of discoverable information, so the propounding party had no reason to employ the enforcement measures provided by the discovery methods.  When the existence of responsive discovery came to light at trial or later, the propounding party was excused from the requirement of a motion to compel, and the court employed sanctions authorized by the discovery chapter to remedy the impact of the discovery abuse.

The instant case is distinguishable.  The City arguably provided false answers about the existence of responsive discovery.  But the City's false answers about the existence of discovery never caused PWC to stop seeking discovery of the information.  PWC was suspicious of the arrangement between the City and Jones early in the case, and despite any false answers that the City gave about the existence of discovery, PWC persisted by using the procedures available to obtain discovery.  After PWC was alerted to the existence of the *Jones v. PWC* draft complaint in the City's original privilege log, PWC actively sought to obtain discovery of the draft complaint over the City's objections by utilizing the procedures provided in the discovery

statutes leading to sanctions. This is not a case in which the court must excuse PWC's lack of compliance with a prerequisite procedure to sanctions in order to impose the sanctions available in connection with that procedure. The cases that have excused a party's compliance with the requirements of a discovery provision, such as a motion to compel discovery, due to the responding party's concealment of the existence of discoverable information, are inapplicable.[7]

### b. Evidence is Unavailable

Courts have also imposed sanctions without requiring compliance with a prerequisite when the responding party's actions have made discovery unavailable, such as through spoliation of evidence. In these cases, a motion to compel discovery would be futile, because the evidence no longer exists as a result of the sanctioned party's misconduct, and therefore,

[7] As guidance to the parties and the trial court on remand, we note that a party's false answers in discovery about the merits of an issue in dispute are addressed through the chapter governing requests for admission. A party may propound a written request to another party to admit the truth of a matter of fact, an opinion related to fact, or an application of the law to fact. (§ 2033.010.) If a party fails to admit the truth of any matter in response to a request for admission, and the propounding party proves the truth of the matter, the propounding party may file a motion for an order awarding the reasonable expenses incurred to prove the matter, including attorney fees. (§ 2033.420, subd. (a).) Cost-of-proof expenses "are recoverable only where the party requesting the admission 'proves . . . the truth of that matter,' not where that party merely prepares to do so." (*Wagy v. Brown* (1994) 24 Cal.App.4th 1, 6.)

56

the court may impose the sanctions authorized by the discovery method.  (*Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 35–36 [motion to compel discovery would have been futile, because plaintiffs conceded they were unable to provide discovery, so order compelling discovery was not required prior to imposing evidence sanction for misuse of discovery process]; *Kwan*, *supra*, 58 Cal.App.5th at pp. 74–78 [trial court was required to impose monetary sanctions under § 2023.030 after finding plaintiffs committed serious discovery abuse by destroying evidence and providing false responses about the existence of discovery]; *Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1209– 1226 (*Karlsson*) [issue and evidence sanctions properly imposed after defendant engaged in a pattern of discovery abuse and concealed evidence, causing evidence to become unavailable]; see *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 17 [declining to create tort remedy for intentional spoliation of evidence because existing remedies within litigation are sufficient, including former § 2023 (current §§ 2023.010, 2023.020, and 2023.030), but not interpreting statutory language "to the extent authorized"].)

The cases addressing the unavailability of evidence as a result of the responding party's conduct are distinguishable.  The present case is not one in which the remedies provided under the Discovery Act were futile.  In its motion for sanctions, PWC listed one instance of spoliation:  Clark's destruction of his notes from interviews that he conducted to prepare for his deposition as the person most qualified to discuss the creation of the *Jones v. PWC* draft complaint.  The purpose of the PMQ deposition, however, was to obtain information about the circumstances surrounding

the drafting of the pleading that would allow the trial court to rule on PWC's motion to compel production of the draft complaint and the City's objection on the ground of attorney-client privilege. Two weeks after Clark's PMQ deposition, the City provided the full draft complaint to PWC.

### c. Supplying Answers During Deposition

Similarly, in some cases where an attorney has supplied answers to a deponent during the deposition, courts have imposed the discovery sanctions authorized under the oral deposition statutes without requiring compliance with prerequisites. (See, i.e., *Sabetian v. Exxon Mobil Corp.* (2020) 57 Cal.App.5th 1054 (*Sabetian*); *Tucker v. Pacific Bell Mobile Services* (2010) 186 Cal.App.4th 1548 (*Tucker*).) The statutes governing oral depositions provide that if a deponent fails to answer a question, the party seeking discovery may file a motion for an order compelling the answer. (§ 2025.480, subd. (a).) The court must impose a monetary sanction against the party, person, or attorney who unsuccessfully makes or opposes a motion to compel an answer without substantial justification. (§ 2025.480, subd. (a).) Some courts, however, have imposed sanctions for supplying answers to a deponent without first requiring the deposing party to file a motion to compel the answers. (See, i.e., *Sabetian*, at pp. 1081–1086 [plaintiff violated trial court order to answer deposition questions to the best of his ability, when attorney coached deponent's answers and suspended deposition, supporting monetary sanctions under Discovery Act against plaintiff and attorney]; *Tucker*, at pp. 1560–1564 [after attorney supplied answers during deposition and threw away notes,

appellate court found motion to compel responses under § 2025.480 was not required to impose monetary sanctions under § 2030.030, but sanctions must be limited to expenses incurred as a result of the discovery abuse].)

In these cases, the deposing party received an answer during the deposition, but the answer was supplied by deponent's attorney, so the deposing party was entitled to remedies provided in the statutes governing oral depositions to remedy the attorney's interference.  We express no opinion as to whether *Sabetian* or *Tucker* was correctly decided; we simply note that both cases are distinguishable from the present case, which does not involve the City's counsel coaching a deponent's answers during deposition.

To the extent that the cases discussed above in which evidence was concealed, unavailable, or coached, including *Pate*, *Sherman, Vallbona, Kwan, Karlsson,* or *Tucker*, state that courts may impose monetary sanctions based solely on section 2023.030, alone or in conjunction with section 2023.010, without regard to whether sanctions were authorized by another provision of the Discovery Act, we respectfully disagree.

## F.  No Inherent Authority to Award Attorney Fees as Monetary Sanction under the Court's Supervisory Powers

In the trial court and on appeal, PWC has suggested that the trial court's inherent power to control the litigation includes the authority to impose monetary sanctions for discovery violations.  This is incorrect.

Trial courts have inherent authority to impose nonmonetary sanctions that are necessary to remedy misconduct

59

and ensure a fair trial (*Olmstead v. Arthur J. Gallagher & Co.* (2004) 32 Cal.4th 804, 809 (*Olmstead*); *New Albertsons, supra,* 168 Cal.App.4th at p. 481), but trial courts may award attorney fees as a sanction for misconduct only when authorized by statute or an agreement of the parties. (*Olmstead*, at p. 809.) Trial courts are prohibited "from using fee awards to punish misconduct unless the Legislature, or the parties, authorized the court to impose fees as a sanction." (*Ibid*.)

The case of *Padron, supra*, 16 Cal.App.5th 1246, relied on by PWC for its argument, is distinguishable based on its unique facts. In *Padron*, the defendant unsuccessfully sought a protective order and willfully refused to comply with the court's order to produce certain discovery, among other discovery proceedings. (*Id.* at pp. 1253–1258.) The plaintiff filed a motion for monetary sanctions. (*Ibid*.) The same defendant in *Lopez v. Watchtower Bible and Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 606, had obtained a reversal of terminating sanctions by contending that lesser sanctions were available, such as monetary sanctions that increased incrementally. (*Padron*, at p. 1249.) The trial court in *Padron* ordered the defendant to pay $2,000 per day for every day that the defendant did not produce responsive documents and $2,000 per day for every day the defendant did not search for responsive documents. (*Id.* at p. 1259.)

The appellate court affirmed the sanctions order without discussing the limiting language of section 2023.030. (*Padron, supra*, 16 Cal.App.5th at pp. 1260–1261.) The defendant contended that the trial court lacked authority to impose monetary sanctions that were unrelated to the plaintiff's reasonable costs to enforce discovery, but the *Padron* court

concluded that the defendant was judicially estopped by prior arguments before the court from asserting this position. (*Id.* at pp. 1260–1263.) In contrast, there is no issue of judicial estoppel in the present case. In addition, it is clear that the defendant in *Padron* unsuccessfully moved for a protective order and violated orders compelling discovery for which monetary sanctions were in fact authorized by provisions of the Discovery Act other than section 2023.030.

The court in *Padron*, *supra*, 16 Cal.App.5th at page 1264, noted that even if judicial estoppel did not apply, monetary sanctions could be imposed under the court's inherent authority to address litigation abuse, citing *Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 762, without acknowledging that *Slesinger* concerned the court's inherent authority to impose nonmonetary sanctions under its supervisory power, and without acknowledging the controlling authority of *Bauguess v. Paine* (1978) 22 Cal.3d 626, 634–638, and *Olmstead*, *supra*, 32 Cal.4th at p. 809, holding that courts may not award attorney fees as a monetary sanction for misconduct unless expressly authorized by statute or contract. We recognize, however, that the amount of monetary sanctions awarded in *Padron* was untethered from any calculation of attorney fees or costs incurred by the plaintiff. The *Padron* court added, "we see nothing in the Civil Discovery Act that expressly prohibits the superior court from imposing monetary sanctions like the ones issued here." (*Padron*, at p. 1265.) Section 2023.030, subdivision (a), however, provides for monetary sanctions in the amount of a party's reasonable expenses incurred as a result of discovery abuse. To the extent that *Padron*, at pages 1264 to 1265, may be read to suggest that the court has inherent authority under its

61

supervisory powers to award attorney fees as monetary sanctions for discovery abuse, we respectfully disagree.

## **Jurisdiction**

The City contends that the trial court lacked jurisdiction to consider PWC's motion for discovery sanctions because it was filed after the case was dismissed with prejudice. We hold that after an action is dismissed with prejudice, the trial court retains jurisdiction to rule on a motion for discovery sanctions as a collateral matter when it is based on a ruling during the action that authorized the court to impose sanctions under a provision of the Discovery Act.

As a general rule, the court lacks jurisdiction to conduct further proceedings with respect to a party who has been dismissed from the action. (*Frank Annino & Sons Construction, Inc. v. McArthur Restaurants, Inc.* (1989) 215 Cal.App.3d 353, 357.) "However, courts have carved out a number of exceptions to this rule in order to give meaning and effect to a former party's statutory rights. Even after a party is dismissed from the action[,] he may still have collateral statutory rights which the court must determine and enforce. These include the right to statutory costs and attorneys fees and the right to notice and hearing on a motion to set aside the dismissal. [Citations.]" (*Ibid.*)

In *Spinks v. Superior Court* (1915) 26 Cal.App. 793, 795, a case relied on by the court in *Frank Annino*, the plaintiff filed a voluntary dismissal of an action on the day before trial and the trial court granted a judgment of costs for the defendant. In collecting on the judgment, the defendant obtained a court order

62

to inspect the plaintiff's books and records, and when the plaintiff refused to comply, the defendant sought a citation for contempt. The trial court concluded the judgment was void, because there was no jurisdiction after the action had been voluntarily dismissed. The appellate court, however, issued a writ of mandate compelling the trial court to proceed with a contempt hearing. The *Spinks* court concluded that although a voluntary dismissal ended the case, "it cannot be contemplated that the legislature, having provided authority and means for the securing of costs to litigants, intended to leave a defendant remediless against a plaintiff who chose to bring an action and put a defendant to great costs in preparing to meet the same and then dismiss the suit." (*Ibid.*)

In this case, PWC brought multiple successful motions to compel discovery during the litigation under provisions of the Discovery Act which required the court to impose monetary sanctions unless there was substantial justification for the City's positions or sanctions were otherwise unjust. PWC was entitled to file a motion seeking monetary sanctions based on PWC's successful discovery motions, and as long as PWC's motion was otherwise timely, the court must determine and enforce PWC's collateral statutory rights to monetary sanctions. The City's dismissal of the action with prejudice could not prevent PWC from obtaining the remedy that PWC became entitled to pursue in connection with the successful discovery motions.

We do not need to decide in this case whether the trial court has jurisdiction to consider a motion for discovery sanctions brought after dismissal of the action in the absence of a discovery ruling during the action for which monetary sanctions were authorized. The trial court granted PWC's motions to compel

discovery and the City's misuse of the discovery process in this case was exposed while the litigation was pending; none of the conduct for which PWC sought sanctions came to light after the case was dismissed.

**Timeliness**

The City contends PWC's motion for monetary sanctions was untimely. We conclude that the timeliness of a motion for discovery sanctions based on a discovery ruling during the action is a matter within the discretion of the trial court, and no abuse of discretion has been shown.

A motion for monetary discovery sanctions may be filed separately, after the underlying discovery motion allowing for an award of sanctions has been litigated. (*London*, *supra*, 117 Cal.App.4th at p. 1001.) The better practice may be to include a request for monetary sanctions within a motion to compel discovery, but the discovery statutes do not require it. (*Id.* at p. 1008.)

In considering the timeliness of a motion for discovery sanctions, we note that parties must complete discovery on or before the 30th day before the initial trial date in order to have a right to have a discovery motion heard. (§ 2024.020, subd. (a); *Pelton-Shepherd Industries, Inc. v. Delta Packaging Products, Inc.* (2008) 165 Cal.App.4th 1568, 1585–1586.) A continuance or postponement of the trial date does not normally operate to reopen discovery (§ 2024.020, subd. (b)), but the court has discretion, after considering circumstances set forth in section 2024.050, to grant leave to complete discovery proceedings closer

64

to the trial date or to reopen discovery after a new trial date is set.  (§ 2024.050; *Pelton-Shepherd*, at pp. 1586–1587.)

In *Colgate-Palmolive Co. v. Franchise Tax Bd.* (1992) 10 Cal.App.4th 1768, 1787–1788, the trial court found a motion for discovery sanctions that the defendant filed seven months after the misconduct, and after winning at trial, was untimely. The motion failed to establish any prejudice to the defendant, because the defendant was successful at trial.  The appellate court affirmed, finding no abuse of discretion, because "a timely motion for sanctions is required to make these sanctions effective." (*Id.* at p. 1788.)

Under the circumstances of the present case, we conclude that the trial court did not abuse its discretion by implicitly finding PWC's motion for discovery sanctions to be timely. Beginning with the February 2017 motion to compel discovery responses, which the trial court granted in part, PWC diligently engaged in protracted discovery proceedings that ultimately revealed the City's misuse of the discovery process.  After the trial court denied PWC's November 2018 motion for monetary sanctions without prejudice to renewing the motion, the City obstructed PWC's efforts to obtain the information necessary for the trial court to make an informed ruling about whether the draft complaint was privileged or must be produced, and unsuccessfully opposed several subsequent motions to compel related discovery.  The City's request for dismissal of the action, and the trial court's entry of dismissal on October 2, 2019, abruptly terminated discovery proceedings before the initial trial date.  The trial court was in the best position to evaluate the time necessary for PWC to prepare a motion for monetary sanctions under the circumstances, based on the lengthy record and the

65

numerous discovery proceedings supporting an award of monetary sanctions.  The City had notice as of March 2019, that PWC intended to seek sanctions, and the City has not identified any prejudice that resulted because the motion for sanctions was not filed earlier.

In summary, although the trial court had jurisdiction to entertain PWC's motion for sanctions and discretion to find it was timely filed, the order awarding sanctions must be reversed and remanded to allow the trial court to award PWC's reasonable expenses incurred as a result of sanctionable conduct under provisions of the Discovery Act other than sections 2023.010 and 2023.030.

## DISPOSITION

The postjudgment order awarding sanctions is reversed, and the matter remanded for the trial court to enter a new and different order on the issue of monetary sanctions based on discovery provisions authorizing the imposition of sanctions in this case.  In the interests of justice, the parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


MOOR, J.


I concur:


RUBIN, P. J.

66

**B310118**
**City of Los Angeles v. PricewaterhouseCoopers, LLP**
**GRIMES, J., concurring and dissenting.**

I would affirm the trial court's order.

This case presents a record of egregious discovery abuse that is unmatched in my experience. The City of Los Angeles (City) does not contend on appeal that it did not engage in discovery abuses for which sanctions are recoverable under the Civil Discovery Act. (Discovery Act; Code Civ. Proc., § 2016 et seq.)[1] And while the City argued *in the trial court* that the hours spent and the amount of fees sought on the motion for sanctions were excessive, the City *did not appeal the order* on the ground that the $2.5 million award was excessive. Instead, the City contends jurisdictional, statutory, and timeliness requirements bar the award. I disagree.

I concur with the majority opinion on the jurisdictional issue: The trial court had jurisdiction to consider the sanctions motion under the circumstances of this case. I also concur with the majority's conclusion that the timeliness of a motion for monetary sanctions is a matter within the trial court's discretion, and the trial court did not abuse its discretion by implicitly finding the motion was timely. The question of timeliness was raised and argued extensively before the trial court, and the court explicitly referred to the timeliness arguments in its ruling from the bench.

I dissent from the majority's conclusion that sections 2023.010 and 2023.030 are "definitional statutes [that],

---

[1]     Further undesignated statutory references are to the Code of Civil Procedure.

1

standing alone or read together, do not authorize the court to impose sanctions in a particular case." (Maj. opn. *ante,* at p. 39.) I likewise dissent from the majority's related conclusion that the trial court must reevaluate the sanctions to be awarded defendant PricewaterhouseCoopers (PwC) based on discovery provisions authorizing sanctions other than sections 2023.010 and 2023.030 (maj. opn. *ante,* at pp. 2–3).

1.     **The Facts**

The majority has described the factual and procedural background at length. Yet that description does not convey the constant and egregious nature of the City's discovery abuse over a period of almost two and a half years. Nor does it describe how gradually, at hearing after hearing, it finally became clear to the trial court that the City Attorney's office, and not just outside special counsel, had colluded from the outset with Mr. Antwon Jones's lawyers to create a settlement in the *Jones* class action against the City that would enrich the lawyers, deprive the *Jones* class of due compensation, defraud the public, and orchestrate the amount of the City's damages in its case against PwC—all the while engaging in a coverup of the collusion by refusing to provide discovery and asserting false claims of privilege. The record discloses the enormity of the City's discovery abuse; its genesis at the very outset in January 2017 and its continuation virtually unabated until the City abruptly dismissed its complaint; and the court's increasing understanding, over the course of numerous hearings, of the scope of the abuse, culminating in the court's ultimate conclusion the City's conduct amounted to a fraud on the court.

This was not a course of conduct that lent itself to piecemeal motions for sanctions for each particular discovery

2

abuse that occurred.  I do not wish to lengthen this opinion unduly with a full recitation of the numerous motions and hearings that reflected the City's long campaign of discovery abuse.  But some repetition is necessary, because it is important to understand that the discovery abuse began in February 2017 with the City's failure to produce the draft Jones v. PwC complaint in response to PwC's first motion to compel production of documents the City withheld as privileged—which were ultimately revealed to be not privileged.  When the Jones v. PwC complaint was finally produced on March 11, 2019, that was by no means the end of the City's discovery abuse.

The court's gradual realization of the magnitude of the City's discovery abuse explains why the court deferred sanctions rulings on two different occasions:  August 27, 2018, and December 5, 2018.  On the first occasion (which involved discovery from a third party apparently represented by the City's counsel), the court stated that "the court is going to allow the parties at a later date to make further request for sanctions if the conduct of refusing to produce documents continues and the court will evaluate the request for sanctions based upon the entirety of the discovery process in this case."  On the second occasion, December 5, 2018, the court stated:  "I'm going to defer any issue of sanctions until we conclude this issue to determine all the facts and circumstances with regard to the matters in dispute.  So the motion for sanctions is denied without prejudice to bringing it back after we get the final information with regard to this particular issue on privilege asserted concerning the Jones versus PwC complaint."  The court's recognition of the need "to determine all the facts and circumstances with regard to the

matters in dispute" before considering sanctions was a manifestly reasonable exercise of discretion.

Before the City finally produced the Jones v. PwC complaint on March 11, 2019, there were at least eight hearings on discovery motions, and there were many more thereafter. I will describe some of the highlights.

On March 6, 2017, there was a hearing on PwC's first motion to compel production of thousands of documents improperly withheld as privileged. The court ordered the production of 17,000-plus documents withheld as work product, but allowed the City to revise its log of attorney-client privileged documents. After that hearing (as the court recites in the ruling now on appeal), "instead of producing the draft of the Jones versus PwC complaint," the City continued to list documents on its privilege log that the court had ordered the City to produce (April 2017); responded to ensuing requests for production of documents transmitted between counsel for the Los Angeles Department of Water and Power (LADWP) and Mr. Jones['s] counsel by claiming (as it turns out, falsely) only one responsive document existed (June 2017); continued to assert privilege claims regarding drafts of the Jones v. PwC complaint (September 2017); and opposed PwC's second motion to compel by arguing PwC's suggestion of collusion in the *Jones* class action was in bad faith (November 2017).

On December 4, 2017, there was a hearing on PwC's second motion to compel, which was made on the same basis as the first. Among the many items of discussion at that hearing were 24 documents the City had previously listed as work product, but the City now claimed were protected by attorney-client privilege, one of which was the Jones v. PwC complaint. The trial court

4

questioned Paul Paradis, the City's special counsel, about the document.  Mr. Paradis answered, saying he drafted the complaint on behalf of the City.  The court asked, "What are you doing as a city attorney drafting a complaint on behalf of Mr. Jones?" and "Is the city attorney's office authorized to file complaints on behalf of ratepayers?"

As the court ultimately discovered—but not until after many more motions and hearings at which the City abused the discovery process by (among other things) raising other false privilege claims—Mr. Paradis lied to the court about the purpose of drafting the Jones v. PwC complaint.  He dodged the court's question about why, if the draft was a matter of exploring legal theories as Mr. Paradis claimed, Mr. Jones's name was on the caption instead of John Doe.  The court said, "I don't quite understand the setup here as to what the attorney was drafting, on behalf of whom.  So I think some more submission ought to be made on that."  PwC reminded the court that the City had the burden to prove privilege, but nonetheless said PwC was prepared to take a deposition of the person most qualified (PMQ) to testify about the circumstances surrounding the creation of the complaint.  The court told PwC, "I think you have to do it, because what we heard today was that the City['s] attorney himself drafted the complaint.  Now we have to find out on behalf of whom or what were the circumstances."  In January 2018, the court ordered the PMQ deposition.

That was the beginning of a long saga of motions and hearings demonstrating, in retrospect, the City's continuous misuses of the discovery process in an effort to prevent the disclosure of the Jones v. PwC complaint and the related misconduct of Mr. Paradis and others.

5

PwC served the PMQ deposition notice, identifying topics for testimony and documents to be produced. Although the court had ordered the PMQ deposition in January 2018, the City moved to quash the deposition notice in April 2018 by asserting it was "unnecessary." In May 2018, PwC filed a motion to compel compliance with the court's order and to strike the City's motion to quash. These motions were heard in June 2018. The court stated that it "ordered the deposition already. I don't think it's necessary to issue a new order to state that I really mean what I already said. [¶] So the court is going to deny the motion to compel compliance," as being "moot, or surplusage. Court's already ordered the deposition to go forward." The court then asked the City if it was going to produce the witness; Mr. Paradis said yes, and that the City would withdraw the motion to quash.

Nevertheless, the City intensified its efforts to prevent disclosure of the draft Jones v. PwC complaint and how it came to be in the files of the City Attorney's office. The City produced a witness in September 2018, Thomas Peters, chief assistant city attorney, as its PMQ to testify about the City's drafting of the Jones v. PwC complaint. But Mr. Peters testified, in effect, that he knew nothing. He brought no documents in response to the production request in the PMQ notice, and he testified he did not look for any. He testified, "I did nothing to prepare myself . . . ." He professed no memory when asked specific questions about the draft Jones v. PwC complaint. He refused to answer questions, for example, about who made the decision to identify Mr. Jones as the named plaintiff in the draft complaint (which he said was a "thought experiment," testimony that was later proven false by documentary evidence). Then counsel and Mr. Peters abruptly walked out of the deposition.

6

As the court later described it: "Mr. Peters . . . was not prepared for his deposition. He did not review the complaint to prepare. Apparently the last time he reviewed it was three years ago in 2015, and apparently the decision was made purposely not to review documents, so he would not be able to answer the questions." Mr. Peters "declined to answer questions by instruction of counsel. The City unilaterally ended the deposition, thus avoiding potential disclosure of the pre-April 1, 2015, relationship between attorney Paradis and attorney Landskroner." (April 1, 2015, is the date the *Jones* class action against the City was filed, and Mr. Landskroner is the Ohio attorney who filed it.)

In November 2018, the City moved for a protective order to prohibit continuing the deposition, and PwC filed a motion to compel the deposition. These motions generated two hearings, on December 5 and December 12, 2018. The rulings at those hearings are reflected in a 10-page order, issued January 24, 2019, granting PwC's motion to compel the PMQ deposition, denying the City's motion for a protective order, ordering production of documents in various categories including documents exchanged between Mr. Jones or his counsel and LADWP prior to April 1, 2015, and specifying questions to be answered by the witness. The court also ordered the depositions of Mr. Landskroner and Mr. Jones.

The order was issued after unsuccessful objections by the City to PwC's proposed order, at yet another hearing on January 23, 2019, at which the City came up with a new theory, claiming a "common interest" privilege in documents exchanged between Mr. Jones or his counsel and LADWP or special counsel or the City Attorney's office. The trial court had this to say about

7

that in its sanctions order: "As I recall, that was a hearing which I inquired the basis for this common interest privilege and counsel for the City could not provide any authority, couldn't articulate what exactly that interest was, except that it was apparently a common interest in orchestrating a settlement. [¶] Of course, if that was true, every plaintiff and every defendant who ever settled a case would have a common interest and could assert all kinds of privileges, but there is no authority for that type of asserted common interest privilege."

Notably, the December 2018 hearings on the City's motion to quash and PwC's motion to compel occurred *a full year after the trial court had ordered* the PMQ deposition. Those hearings reflect the continued duplicity of the City's special counsel, and the court's recognition of that duplicity. On December 5, the court stated, "Well, let me get back to the initial question that was asked months ago; and that is, how did this complaint come about?" And, in an exchange with Mr. Kiesel, "you're saying that the City retained services of counsel to draft a complaint against itself?" Mr. Kiesel said he could not respond without violating a privilege. The court warned counsel that PwC's counsel was "not going away, and you would think that counsel would want to cooperate and get this over as quickly as possible rather than make it more difficult and drag it out." If the information was not forthcoming from the City, the court warned, then "he's going to take the deposition of Mr. Antwon Jones, he's going to take the deposition of the attorney in Ohio [Mr. Landskroner], and we're going to find out what happened here."

At the continued hearing on December 12, 2018, Ms. Tufaro, another special counsel for the City, stated the City was refusing to produce (among other things) written agreements

8

or understandings between the City and Mr. Jones prior to April 1, 2015, asserting yet another new theory, the "potential mediation privilege." When the court asked Ms. Tufaro whether Mr. Jones was ever represented by the City Attorney's office "or counsel for the City," she answered, "No, Your Honor." Later, after a recess, Mr. Kiesel revealed to the court that "special counsel did have a relationship with Mr. Jones," but "[t]he City Attorney's office never had any relationship to Mr. Jones at all."

This was the first time the City apprised the court of Mr. Paradis's relationship with Mr. Jones. But, far from coming clean, the City tried to conceal its own complicity by laying everything at the door of a few special counsel "rogue actors," all purportedly unbeknownst to the City Attorney's office.

At the January 23, 2019 hearing mentioned above, in the course of questioning the City's counsel about the claim of a common interest privilege, the court said: "So you're telling me the whole filing of the lawsuit was a setup?" Mr. Paradis said he was not saying that, but refused to answer the court's following questions, asserting privilege. After Mr. Paradis said that city attorney Tom Peters directed him to refuse to allow Mr. Peters to answer the question "during what period of time was Mr. Jones represented by Mr. Paul Paradis," the court turned to Mr. Kiesel to ask whether the City had an ethics department. The court commented that an internal investigation should be considered "as to what happened here." The court further stated it had already ordered the PMQ deposition to go forward and "I don't want to hear reassertion of the same objections over and over that have been overruled." And, "if we have a continuous assertion of inappropriate objections, the remedies of sanctions and contempt are available."

On February 12, 2019, the City produced only the caption and title page of the draft Jones v. PwC complaint. On February 26, 2019, James Clark, chief deputy city attorney, appeared as the City's new PMQ witness. Mr. Clark testified that in preparation for his deposition, he interviewed Mr. Paradis, Ms. Tufaro, Mr. Kiesel, Mr. Peters, and others. He took notes at these interviews, but he discarded them before the deposition. Among other things, he "acknowledged his knowledge prior to the filing of the Jones versus City of Los Angeles complaint that Paradis had recruited Landskroner to sue the City."

At a lengthy status conference hearing on March 4, 2019, PwC reported the City had agreed to produce the Jones v. PwC complaint. (In a March 1, 2019 brief on privilege issues requested by the court, the City continued to assert the common interest privilege, "but admitted in writing it was made aware of the Paradis/Jones attorney-client relationship during its first meeting with Paradis and Kiesel in December, 2014.") Under questioning by the court, Mr. Peters stated the City agreed to waive attorney-client and work product privileges with respect to the Jones v. PwC complaint, but not with respect to any other document.

A great deal more was discussed at the March 4, 2019 hearing, with Mr. Landskroner asserting Fifth Amendment privileges when asked about his fees for the class action settlement and the existence of a fee-splitting arrangement with Mr. Paradis. PwC told the court that Mr. Clark testified at his deposition that he took notes of interviews with witnesses before his deposition but destroyed the notes before the deposition. Among other things, the court ordered the preservation of

10

documents; ordered depositions of Mr. Landskroner and Mr. Kiesel to begin in the following days; and indicated its intention to restrain the City from issuing any funds to Mr. Landskroner and Mr. Paradis and to appoint a special master to audit all payments to them.

I find it notable that, as I mentioned earlier, the trial court expressly stated, three months earlier at the December 5, 2018 hearing, that the issue of sanctions would be deferred and could be brought again "after we get the final information with regard to this particular issue on privilege asserted concerning the Jones versus PwC complaint." That did not come until, after the March 4 hearing, the City finally produced the draft complaint, on March 11, 2019. And, at a hearing on March 19, 2019, PwC indicated its intention "to make one or more motions, including a motion for case terminating sanctions." This is consonant with the court's December 5, 2018 statement that a motion for sanctions could be brought again after the privilege issue was resolved.

But the City's discovery abuses did not end with its production of the Jones v. PwC complaint in March 2019. That was only the beginning of discovery disclosures—continuously resisted by the City—that would ultimately lead the court to conclude that PwC had made a prima facie showing of fraud on the court by the City. PwC was obliged by the City's intransigence *after* the City produced the Jones v. PwC complaint to take many more depositions that, among other things, would reveal the falsity of the City's claim that the conduct finally uncovered in March 2019 was attributable only to so-called "rogue actors" in special counsel's office.

11

These post-March 2019 depositions were critical to show PwC was entitled to terminating sanctions. Obtaining the Jones v. PwC complaint alone did not explain how it came to be in the City Attorney's files, and did not and could not disclose the story of collusion, lies and coverups within the City Attorney's office. Only the deposition testimony of witnesses—lawyers—within the City Attorney's office could do that. The City's obstruction after it finally produced the Jones v. PwC complaint is every bit as shocking as its previous conduct.

I have already described the PMQ deposition of Mr. Peters, for which Mr. Peters did not prepare, refused to answer questions or produce documents, and walked out. Then, after the court ordered a continued PMQ deposition, the City produced a new PMQ witness, Mr. Clark, who in March 2019 (after a meeting with six other attorneys for the City), made 54 changes to his deposition testimony.

As the trial court described it, in the errata to Mr. Clark's deposition testimony "Mr. Clark recanted or disclaimed numerous material aspects of his February deposition testimony thus necessitating two further dates of deposition testimony from Mr. Clark." In the errata, Mr. Clark (according to a PwC declaration) recanted or qualified portions of his February testimony that would have undermined the City's position that it was not aware of any improper conduct involving the settlement of the *Jones* class action. The trial court stated that during the continued PMQ deposition in April 2019, "Mr. Clark recanted additional prior testimony which in turn necessitated PwC taking an additional 18 fact witness depositions." In other words, the City's years-long course of obstruction, obfuscation and outright lies continued unabated after the March 2019 production of the

12

Jones v. PwC complaint, demonstrating (in addition to the City's perfidy) the wisdom of the trial court's decision not to determine sanctions on a motion-by-motion basis but rather to await PwC's development of the necessary evidence for the terminating sanctions it hoped to obtain.

Meanwhile, at a hearing on March 13, 2019, after lengthy discussion, the court ordered Mr. Jones to produce (over Mr. Paradis's objection) a draft of the Jones v. PwC complaint that Mr. Paradis had sent to Mr. Jones on January 9, 2015. The court concluded that was a communication with an adverse party because Mr. Paradis was representing the City at the same time, resulting in waiver of attorney-client and work product privileges. The court further found that PwC "has presented sufficient evidence to establish a prima facie case of fraud by the City and its counsel, fraud on Mr. Jones, possible fraud on the public, and possible fraud on the court." The court stated that "[a]t this time [the finding was] limited to [this] particular document."

At hearings during the courthouse deposition of Mr. Kiesel in May 2019, "the court permitted Mr. Kiesel's voluntary production of multiple documents over which the City and Mr. Paradis had asserted objections finding that PwC had made a showing, a prima facie showing, of fraud." Still more hearings ensued, in July and August 2019.

In July 2019, PwC filed two more motions to compel, one concerning documents withheld on the basis of a claimed mediation privilege, and another concerning communications "relating to special counsel Paradis' representation of Jones and the Jones settlement." In its opposition on July 12, 2019, the City continued to insist that "the City was unaware of [the

13

misconduct of former special counsel] or their entirely unauthorized activities."

The July 25, 2019 hearing concerned PwC's motion to overrule the City's mediation privilege objections, involving six mediation sessions on the settlement of the *Jones* class action. At the hearing, both Mr. Jones and the City waived the mediation privilege, but the City contended the consent of all parties and the mediator was required. The court ordered all documents previously withheld on grounds of mediation privilege to be produced. The court's usual thorough findings and analysis included that, for there to be a mediation privilege, there must have been a mediation between adversaries. Here, there was "a collusive play acting," a "charade" that was "akin to a fraud on the court."

The August 12, 2019 hearing involved PwC's motion to compel further discovery responses to requests for production of documents served in March 2019, relating to the Jones v. PwC complaint, "which then morphed into the Jones versus City of Los Angeles action," such as communications between the City and either Mr. Paradis or Mr. Kiesel relating to either of those cases. PwC made a lengthy argument summarizing the City's discovery abuses, to show that PwC made a prima facie case for the crime or fraud exception under Evidence Code section 956 and asking the court to order production of the documents and not the "drip, drip, drip" the City had been providing. PwC's counsel observed: "We need to get the documents produced so we can make our motion [for sanctions]."

The City's special counsel (who replaced the Kiesel-Paradis-Tartufo group in March 2019) argued he and his team had reviewed thousands of documents and "there is not a single

14

one that any of us is aware of that would demonstrate that the City itself, as opposed to its former now discredited outside counsel, had any knowledge or involvement in any scheme by which the City was sued." Counsel argued, among other points, that Mr. Kiesel's deposition testimony implicating various city attorney personnel in the scheme should be discredited. When the court grilled counsel on what the City knew, counsel argued that, assuming the City was aware, awareness is not acquiescence.

After lengthy argument, the court ordered production of the documents. Among many other points, the court cited Mr. Kiesel's testimony that Mr. Clark and Mr. Peters met with Mr. Kiesel and Mr. Paradis in February 2015, after Mr. Paradis circulated the Jones v. PwC complaint to the City Attorney's office, and they "not only approved the plan to use Jones as a named plaintiff in a comprehensive action to be filed against the City, but that attorney Paradis was directed to do so by the City." The court found there was considerable prima facie evidence of the City's complicity, such that "to the extent there was a[n] [attorney-client] privilege, that privilege has been waived."

On August 21, 2019, the court ordered the City, which did not object, to substantially complete document production by August 31, 2019.

That brings us to the last hearing before (*one day* before) the City dismissed its complaint. On September 25, 2019, the City still had not completed its production of documents that PwC requested almost six months earlier, nor a set requested in May. PwC also advised the court it had recently served a request for production of 30 specific documents that had been identified by witnesses during the ongoing depositions. PwC referred to

15

"documents that are long overdue" and certain depositions, stating that "we would like to have that done in the next three weeks so we could bring our motion for case terminating and monetary sanctions."

The court set October 15 as the end date for "complete production of all the documents the City has in custody and control," as well as a detailed privilege log if needed. That never happened, because the next day the City voluntarily dismissed its complaint against PwC, as the court later stated, "avoiding production of documents covered by the court's July 25 and August 12 orders." The dismissal was entered on October 2, 2019.

PwC did not file its motion for sanctions until nine months later, on June 29, 2020. In the interim, PwC undertook efforts spanning October, November and December 2019 to compel the discovery that had been ordered or instituted before the City dismissed its complaint. PwC's position was that the uncompleted production of documents requested by PwC between March 29 and September 13, 2019, included documents falling within the crime-fraud exception to the attorney-client privilege. PwC needed those documents because "that presumably would directly highlight the City's knowledge of and role in the collusive *Jones v. City of Los Angeles* action," and PwC never had the chance to confront City witnesses with documents which PwC contended "directly undercut the City's false narrative of rogue Special Counsel."

PwC's efforts on this score ultimately failed. At a hearing on December 19, 2019, the court observed that "[t]his discovery motion is obviously a prelude to the sanctions motion to be filed by Pricewaterhouse." The court concluded it "would be

16

inappropriate and unauthorized to create a new round of litigation over discovery for the purposes of litigating a discovery motion for sanctions after dismissal."  An order to that effect was entered on January 15, 2020.

## 2. The Motion for Sanctions and the Ruling

The majority has described PwC's June 29, 2020 motion for monetary sanctions, seeking over $8 million, and the court's award of $2.5 million.  The trial court recited the "primary circumstances" in support of the award.

The court explicitly identified its grants of three of PwC's motions to compel production of documents, on March 6, 2017, July 25, 2019, and August 12, 2019.  The court referred to the City's relogging of documents in April 2017 as privileged "instead of producing the draft of the Jones versus PwC complaint."  The court identified the City's June 2017 response to PwC's request for documents transmitted between LADWP's counsel and Mr. Jones's counsel before April 1, 2015, claiming there was only one responsive document, and then finding in a production in 2019 (more than a year and a half later) that there were multiple responsive documents.  The court recited the City's continued unfounded assertion of privilege claims in September 2017, and the City's claims in November that PwC's suggestion of collusion in the *Jones* class action was in bad faith.  The court cited its order for the PMQ deposition on December 4, 2017; the City's failure to apprise the court at that hearing of the attorney-client relationship between Mr. Paradis and Mr. Jones; the ensuing motions and hearings that included false statements to the court that Mr. Paradis never represented Mr. Jones; and its January 24, 2019 order, more than a year later, granting PwC's motion to compel the PMQ deposition, denying the City's motion

17

for a protective order, and overruling the City's objections to requests for production at the PMQ deposition. The court cited the City's unfounded claims of a common interest privilege beginning in January 2019.

The court's list of the City's discovery abuses goes on, and it includes the March and post-March 2019 motions and hearings, including the court's orders for depositions, the City's assertion of a mediation privilege, and the court's findings on March 13 and again on August 12 of a prima facie case of fraud by the City.

It is on that basis—a basis I view as manifestly sound— that the court found there was "a serious abuse of discovery by the City and its counsel"; "PWC has been required to expend substantial number of hours because of the abuse in discovery"; and "[t]his serious abuse merits considerable sanctions."

3.    **The City's Appeal**

The City in its opening brief on appeal asserted only two claims of error. The first was the jurisdictional issue rejected by the majority, with which I concur. The City's only other argument was that, even if the court had jurisdiction, PwC's motion was untimely, which the majority also rejected, with which I concur.

Notably, the City did *not* assert in its opening brief that it did not engage in discovery abuses for which sanctions are recoverable under sections 2023.010 and 2023.030. And while the City argued *in the trial court* that the hours spent and the amount of fees sought on the motion for sanctions were excessive, the City did not appeal the order on the ground that the $2.5 million award was excessive—only that it was untimely. Only now, at the suggestion in this court's Government Code letter after briefing was completed, does the City maintain the

18

trial court erred in relying on sections 2023.010 and 2023.030 "as a purported basis for imposing sanctions."  I disagree with that claim, as I do with the majority's unprecedented statutory analysis.

## 4.      The Statutory Issue

At the December 19, 2019 hearing at which the court denied PwC's motion to compel responses to previously ordered discovery, and acknowledged PwC would be filing a motion for sanctions, the court said this:  "I recognize this case is sui generis, I think everyone recognizes that."

The majority does not.  Instead, the majority concludes the trial court abused its discretion, on the ground that "[a] decision 'that transgresses the confines of the applicable principles of law is outside the scope of discretion' and is an abuse of discretion." (*New Albertsons, Inc. v. Superior* Court (2008) 168 Cal.App.4th 1403, 1422 (*New Albertsons*).)  The "applicable principle[] of law" that the trial court transgressed, according to the majority, is a principle announced for the first time today—one that has never before been applied in any published opinion or argued by counsel, one that was not raised in the trial court below, and one that was not raised by the City in this appeal.

I see no basis in statutory law, case law, or common sense to conclude, as the majority does, that sections 2023.010 and 2023.030 "do not authorize the court to impose sanctions in a particular case," or that section 2023.030 does not "independently" authorize the court to impose sanctions for discovery misconduct.  (Maj. opn. *ante,* at pp. 39, 46.)  I read those statutes just as other courts, up to now, have universally done.

19

There are several areas of legal precedent that support my conclusion.  There is one case in particular of egregious discovery abuse with similarities to this case (though not nearly so deeply disturbing as the City's abuses in this case), where the court found it was an abuse of discretion *not* to impose sanctions under section 2023.030.  There are cases that hold the "[t]o the extent authorized" language of section 2023.030 simply refers to authority to impose the *type* of sanction in question (here, monetary).  And there are still other cases where the courts approve the imposition of various types of sanctions under section 2023.030 where a party has engaged in a pattern of discovery abuse, and do so without regard to the prerequisites for sanctions specified under a particular discovery method.  In my view, these authorities leave no room for the majority's newly minted holding that the trial court acted "outside the bounds of the court's statutory authority" (maj. opn. *ante,* at p. 49).

### a.     The *Kwan* case

I begin with *Kwan Software Engineering, Inc. v. Hennings* (2020) 58 Cal.App.5th 57 (*Kwan*), as to which the majority says little more than it "respectfully disagree[s]."  (Maj. opn. *ante,* at pp. 59, 57.)  I see very little daylight between this case and *Kwan*, which likewise involved conduct described as "extensive and deliberate misconduct" and "egregious litigation conduct that included abuses of the discovery process" (*Kwan,* at p. 75), for which millions of dollars in sanctions were sought (*id.* at p. 76). (Defense counsel argued at one hearing:  " 'If with our initial discovery way way back in the beginning of this case the truth had been told instead of the falsehoods, the entire case would have taken a very very very different turn and we would not have incurred four million [dollars].' " (*Id.* at p. 68.))  The trial court in

20

*Kwan* granted terminating sanctions for the plaintiffs' fraud on the court but denied monetary sanctions.  The Court of Appeal found the denial of monetary sanctions, sought under section 2023.030, was an abuse of discretion.  (*Kwan,* at pp. 62, 77.)

*Kwan* explained the trial court was mistaken in concluding that any monetary discovery sanction would constitute punishment.  (*Kwan, supra,* 58 Cal.App.5th at p. 76.)  The trial court's order for terminating sanctions was based on the plaintiffs' fraud on the court, "not on the discovery misconduct they visited on defendants."  (*Ibid*.)  *Kwan* found "no authority for the proposition that the trial court's imposition of other sanctions, such as terminating sanctions, has any bearing on the legal question of whether defendants were also entitled to an award of the compensable fees mandated by section 2023.030(a)." (*Ibid*.)

Further, *Kwan* stated, "[w]hile the consideration of punishment might well influence the amount of monetary sanctions the trial court should award, it has no bearing on the threshold question of whether defendants were statutorily entitled under section 2023.030(a) to at least some monetary sanctions for the reasonable attorney fees they incurred as a result of [the plaintiffs'] misuse of the discovery process."  (*Kwan, supra,* 58 Cal.App.5th at p. 77; see *ibid.* ["it was arbitrary and an abuse of its discretion for the trial court to decline to award *any* amount of monetary sanctions in light of its explicit finding that discovery misconduct, in the form of false deposition testimony and spoliation of evidence, had occurred"].)  The *Kwan* court emphasized the final sentence of section 2023.030, subdivision (a):  "If a monetary sanction is authorized by any

21

provision of this title, the court <u>shall impose</u> that sanction," absent substantial justification or other unjust circumstances. (*Kwan,* at pp. 73–74, italics omitted & underscoring added.)

### b.    The *London* line of cases

No case precedents actually support the majority's novel conclusion that sections 2023.010 and 2023.030 do not authorize a court "to impose sanctions in a particular case." (Maj. opn. *ante,* at p. 39.)  The majority cites *London v. Dri-Honing Corp.* (2004) 117 Cal.App.4th 999 (*London*) and *New Albertsons, supra,* 168 Cal.App.4th 1403, but both of those cases simply tell us that the language in question—"[t]o the extent authorized by the chapter governing any particular discovery method"—in section 2023.030 refers to the *type* of sanction that may be imposed, and *not* to the procedural requirements contained in the statutes governing particular discovery methods.

*London* found the "[t]o the extent authorized" language of what is now section 2023.030 "simply refers to whether the discovery method statute authorizes a type of sanction (i.e., monetary, issue, evidence, terminating, or contempt) for a particular misuse of the discovery method." (*London, supra,* 117 Cal.App.4th at p. 1006.)  The *London* court explicitly rejected the notion that the "[t]o the extent authorized" language "absorbs all the procedural requirements of the particular discovery method statute." (*Id.* at p. 1005.)

The issue in *London* was the defendant's claim that the plaintiff's request for monetary sanctions was untimely because it was not included in his motion to compel further responses to an inspection demand under the statute governing that particular discovery method. (*London, supra,* 117 Cal.App.4th at p. 1002.) The court disagreed.  It stated the "pivotal language to be

22

interpreted here" was the "[t]o the extent authorized" language of what is now section 2023.030. (*London,* at p. 1004.) "A better reading is that this language simply refers to whether a particular discovery method statute authorizes a specific type of sanction (i.e., monetary, issue, evidence, terminating, or contempt sanctions)." (*Id.* at p. 1005.)

The *London* court explained that the general structure of the Discovery Act supported its conclusion. Among other points, the court cited the "emphasis on imposing discovery monetary sanctions against abusive parties." (*London, supra,* 117 Cal.App.4th at p. 1006.) The court described the structure of the Discovery Act, observing that section 2023 (now sections 2023.010 and 2023.030) generally identifies possible discovery abuses and the types of sanctions that exist, and that the statute governing a particular discovery method specifies which of those sanctions applies to the particular abuses of that method. The court found that structure suggested the "[t]o the extent authorized" language merely referred to the type of sanction. (*London,* at p. 1006.) The court found its interpretation was further supported by language in what is now subdivision (a) of section 2023.030, "stating that '[i]f a monetary sanction is authorized by any provision of this [title], the court shall impose that sanction' unless" it is unjust to do so. (*London,* at p. 1006.) That language, the court said, "works in tandem with" the "[t]o the extent authorized" language. (*Ibid.*)

*New Albertsons* applied the same principle, and expressly relied on *London. New Albertsons* found that evidence and issue sanctions in that case were *not* authorized. (*New Albertsons, supra,* 168 Cal.App.4th at p. 1422.) Specifically, the trial court had no statutory authority to impose evidence and issue

23

sanctions "absent a failure to obey an order compelling discovery . . . ." (*Id.* at p. 1408.) The court explained that "[t]he statutes governing each discovery method authorize particular types of sanctions in particular circumstances." (*Id.* at p. 1423.) The specific statutes governing the inspection demand at issue in *New Albertsons* stated that a court must impose a monetary sanction against a person who unsuccessfully makes or opposes a motion to compel a further response to an inspection demand, but provided for imposition of an issue, evidence or terminating sanction "only '[i]f a party fails to obey an order compelling' " the discovery. (*Id.* at pp. 1423–1424, citing specific discovery statutes.) *New Albertsons* is simply another application of the *London* principle.

The majority also cites *Zellerino v. Brown* (1991) 235 Cal.App.3d 1097 (*Zellerino*). Like *London* and *New Albertsons, Zellerino* says that former section 2023, subdivision (b), now section 2023.030, "limits the permissible sanctions to those 'authorized by the [chapter] governing any particular discovery method.' " (*Zellerino,* at p. 1114.) The *London* court also cited *Zellerino* as supporting *London*'s interpretation, observing that in *Zellerino*, "the language [of the statute] involving the phrase 'to the extent authorized' was used not to invoke procedural time limits of the governing discovery method statute, but to identify what types of sanctions a given discovery method statute authorized for a particular abuse." (*London, supra,* 117 Cal.App.4th at p. 1007, citing *Zellerino*.)[2]

---

[2] In *Zellerino*, the plaintiff failed to comply with multiple requirements of the statutes on exchange of expert witness information (*Zellerino, supra,* 235 Cal.App.3d at p. 1114), and her conduct fit into several of the categories of misuse of the

24

I have no disagreement with *London* or *New Albertsons* or *Zellerino,* and I do not see how they offer any support for the majority's position. They stand for the general proposition that a particular discovery method must authorize a particular *type* of sanction before a court can impose that sanction under section 2023.030. They do not support the majority's conclusion that this case must go back to the trial court "for determination under the correct law" (maj. opn. *ante,* at p. 3).

I understand the majority to mean that the trial court, instead of assessing the City's course of conduct throughout this litigation, must instead assess compliance with the specific procedures or prerequisites of the particular discovery method in connection with each individual motion that PwC successfully made or defended against—and then determine expenses reasonably incurred in connection with that item. (See maj. opn. *ante,* at pp. 49–51.) That approach ignores the principle applied in *London* and *New Albertsons,* and consequently ignores the fact that monetary sanctions for the discovery abuses found by the trial court—withholding documents and asserting false claims of privilege to prevent document production and depositions—*are* authorized by other provisions of the Discovery Act. Indeed, the majority describes provisions authorizing monetary sanctions,

---

discovery process in section 2023 (now section 2023.010). (*Zellerino*, at p. 1114.) The specific statute governing exchange of expert witness information provided for the exclusion from evidence of the expert's opinion for such failures. (*Ibid*.) The court concluded, "[g]iven the near-total failure to comply with the requirements of the statute," that "the order preventing [the plaintiff] from introducing expert testimony was within the court's discretion, even though the effect was that it terminated her lawsuit." (*Id*. at p. 1117.)

25

under sections of the Discovery Act other than sections 2023.010 and 2023.030, that authorize the sanctions award in this case. (Maj. opn. *ante,* at pp. 40, 44, citing provisions of the chapters on inspection and production of documents and oral depositions.)

In short, monetary sanctions are authorized in the various discovery statutes for the kinds of discovery violations the trial court found to have occurred. In my view, no more is required to enable the trial court to award monetary sanctions under section 2023.030 for the egregious and ongoing misuses of the discovery process at issue here.

### c.     Cases imposing sanctions under section 2023.030

The majority says cases are not authority for propositions not considered, and the numerous cases that have determined sanctions were properly imposed under section 2023.030 "fail to mention" the introductory, "[t]o the extent authorized," language. In those cases, the majority tells us, "the facts reflect that sanctions were authorized by a discovery provision other than sections 2023.010 and 2023.030, and the court's authorization to impose sanctions was not at issue." (Maj. opn. *ante,* at pp. 52–53, citing cases.)

Let us not forget that, except for the City's jurisdictional and timeliness claims, the trial court's "authorization to impose sanctions" was never asserted as an issue in the trial court or on appeal, until the majority put it at issue with its own novel statutory analysis, never before argued by counsel and never before considered by any other California court.

I will not describe all the cases that "fail to mention" the "to the extent authorized" language of section 2023.030, thus making

26

them, according to the majority, inapt as precedents.  But here is one example.

In *Pratt v. Union Pacific Railroad Co.* (2008) 168 Cal.App.4th 165 (*Pratt*), the trial court found the defendant's actions "circumvented the established procedures for civil discovery under California law"; granted a preliminary injunction prohibiting the defendant from conducting a disciplinary proceeding or from compelling the plaintiff to attend an extrajudicial medical examination; and awarded sanctions.  (*Id.* at p. 170.)  The Court of Appeal "deem[ed] the temporary injunction a protective order" (*id.* at p. 182), and found monetary sanctions were not an abuse of discretion (*ibid.*).  Citing sections 2023.010 and 2023.030, the court stated:  "[T]he trial court has discretion to impose monetary sanctions when one party *persists*, over objection and without substantial justification, in an attempt to obtain information outside the scope of permissible discovery."  (*Pratt,* at p. 183.)

*Pratt* explained:  "That is precisely what Union Pacific did. Pratt's counsel objected to Union Pacific's ex parte demands for medical information and made every effort to secure Union Pacific's agreement to postpone the disciplinary hearing until the court heard his motion for injunctive relief.  Instead, Union Pacific gave equivocal responses while failing to agree to the requested postponement, forcing counsel to seek a temporary restraining order.  [¶]  This record clearly supports the trial court's finding that Union Pacific's actions circumvented the discovery process and were without substantial justification." (*Pratt, supra,* 168 Cal.App.4th at pp. 183–184.)

No other provisions of the Discovery Act were cited in *Pratt*, and I for one find it hard to see how the distinctive facts in

27

*Pratt* "reflect that sanctions were authorized by a discovery provision other than sections 2023.010 and 2023.030" (maj. opn. *ante,* at p. 52).

The majority is at great pains to distinguish the case here from several other cases where the courts have relied on section 2023.030 and have dispensed with the prerequisites for sanctions under a particular discovery method (such as the requirement to file a motion to compel).  (Maj. opn. *ante,* at pp. 53–59.)  Most of these cases involve the imposition of evidence or issue preclusion sanctions.  An example is *Pate v. Channel Lumber Co.* (1997) 51 Cal.App.4th 1447 (*Pate*).  There, the defendant had assured the plaintiff repeatedly, and falsely, that all relevant documents had been produced, and then sought, midtrial, to introduce documents not provided during discovery.  (*Id.* at p. 1452.)  The trial court found the defense had "played fast" with the discovery rules and "had made an 'absolute and deliberate attempt to thwart discovery for the purpose of gaining a tactical advantage at . . . trial' " (*id.* at p. 1454); "given the late date at which the misuse of discovery procedures surfaced," the court precluded the defendant from introducing any documents not provided before trial (*id.* at p. 1453).

*Pate* rejected as "specious" the defendant's argument that the trial court had no authority to impose an evidentiary sanction because the plaintiffs did not move prior to trial to compel further responses for production of documents.  (*Pate, supra,* 51 Cal.App.4th at p. 1456.)  The plaintiffs had served three separate requests for production of documents and received repeated assurances that all documents had been produced.  Citing what is now section 2023.030, subdivision (c), the court concluded, "Plaintiffs were not required to move to compel further

28

responses as a prerequisite to invoking the trial court's discretion in imposing a discovery sanction." (*Pate,* at p. 1456.)

The majority says *Pate* and two other similar cases involving "false answer[s] concealing the existence of discoverable information" are "inapplicable."[3] (Maj. opn. *ante,* at pp. 54, 56.) This case is distinguishable, the majority says, because the City's false answers to discovery requests—which continued over a two-year period—did not cause PwC "to stop seeking discovery of the

---

[3] The other cases are *Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1163, 1155–1156, 1162 (monetary sanctions were "absolutely *mandated*" under former section 2023 (now sections 2023.010 and 2023.030) where the defendant's discovery abuse, which "subverted justice," was not discovered until after the verdict against the plaintiffs; "the court had not only the power, but the duty to sanction [the defendant], in a monetary amount *at least* sufficient to cover all the costs incurred by the [plaintiffs], including attorney fees, in going through a trial which must now be redone"; the defendant's "continuing disregard of its discovery obligations, as well as its witnesses' utter lack of candor, if not outright lies, at trial, clearly entitled the [plaintiffs] to sanctions"); and *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1545–1546, 1543 (the trial court properly imposed an evidence sanction under section 2023 (now section 2023.030) "without a prior order to compel defendants' compliance with discovery," notwithstanding the requirements of the statute on inspection demands; requiring the plaintiffs to seek a formal order to compel the defendant to comply with discovery would have been futile because he had claimed the requested documents were stolen; the trial court "told defense counsel it was 'a total reprehensible violation of this court's rules, practices, and policies for a litigant to withhold documentation that is the subject of discovery and then surprisingly and unexplainedly find them during the trial' ").

29

information," and instead PwC "persisted by using the procedures available to obtain discovery." (Maj. opn. *ante,* at p. 55.) I am unable to grasp that distinction or to understand why PwC's continuous efforts to obtain documents, in the face of the City's continuous obstruction of those efforts, has any bearing on the trial court's discretion, universally recognized until now, to award monetary sanctions under section 2023.030.

Then the majority turns to still other cases allowing sanctions under section 2023.030 or its predecessor when "the responding party's actions have made discovery unavailable, such as through spoliation of evidence." (Maj. opn. *ante,* at p. 56.) An example the majority cites (which does *not* involve spoliation of evidence) is *Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202 (*Karlsson*), where the trial court's evidence and issue preclusion sanctions "were based on a pattern of discovery abuse that effectively led to the loss of various items of evidence." (*Id.* at p. 1214.) The court relied on cases that "have held that violation of a discovery order is not a prerequisite to issue and evidentiary sanctions when the offending party has engaged in a pattern of willful discovery abuse that causes the unavailability of evidence." (*Id.* at p. 1215.)

In *Karlsson,* the defendant's discovery abuses resulted in the "unavailability of evidence" because the discovery cutoff had passed and trial was imminent, so the plaintiffs "lost the opportunity to explore fully any leads obtained from discovery that should have been produced." (*Karlsson, supra,* 140 Cal.App.4th at p. 1215; see *id.* at p. 1216 [the trial court found that a violation relating to a PMK deposition issue "was 'part and parcel of a whole history of stonewalling, wild goose chases, too little, too late,'" and the "PMK incident 'was the last

30

straw in a series of violations that kept on continuing and continuing and continuing' "].)[4]

The majority also distinguishes cases where the courts "have imposed sanctions for supplying answers to a deponent without first requiring the deposing party to file a motion to compel the answers." (Maj. opn. *ante,* at p. 58.)  The distinction is that the present case "does not involve the City's counsel coaching a deponent's answers during deposition." (*Id.* at p. 59.)  I cannot see the relevance of that distinction.  And anyway, I think the City instructing witnesses not to answer questions based on unfounded privilege objections and walking out of a

---

[4]     Another of these cases cited by the majority (*ante,* at p. 57) is *Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27.  In that case, the trial court's determination that the plaintiffs misused the discovery process, and its imposition of an evidence preclusion sanction under section 2023 (now section 2023.030), was "amply supported" by a record "replete with instances of plaintiffs' attempts to delay trial in this matter and withhold promised items of discovery" (principally an audit of records).  (*Do It Urself, supra,* 7 Cal.App.4th at pp. 36, 32.)  The court rejected the plaintiffs' claim the trial court abused its discretion because there was no previous court order on the audit report.  (*Id.* at p. 34.)  In addition to rejecting the claim as a conclusional argument without citation of authority, the court observed that the legal authorities requiring disobedience of a court order prior to imposition of sanctions harsher than monetary sanctions were distinguishable from the circumstances before the court.  (*Id.* at pp. 35–36.)  The plaintiffs had told the trial court that the audit that had been promised and said to be almost complete months earlier (*id.* at pp. 31–32) "will never be completed" (*id.* at p. 33), and so could not be provided, making a formal court order to comply futile (*id.* at p. 36).

31

deposition midstream is at least as abusive, if not more so, than coaching a witness.

I further note the Supreme Court's comments in *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 17, where the court declined to create a tort remedy for intentional spoliation of evidence. The court discussed the broad range of potent sanctions for misuse of the discovery process under then-section 2023, and observed that "[d]estroying evidence in response to a discovery request after litigation has commenced would surely be a misuse of discovery within the meaning of section 2023, as would such destruction in anticipation of a discovery request." (*Id.* at p. 12; see *id.* at p. 17 ["remedies already available . . . , especially [the evidentiary inference in the Evidence Code] and the discovery remedies of Code of Civil Procedure section 2023, provide a substantial deterrent to acts of spoliation"].) And yet, so far as I am aware, the chapters of the Discovery Act governing particular discovery methods do not mention sanctions for spoliation of evidence.

Moreover, I see no conceivable reason to distinguish discovery abuse in cases where the abuse succeeds in making evidence unavailable, and discovery abuse that, after years of obstruction, fails in the end to avoid production of the sought-after evidence (and instead leads to the sudden dismissal of the case by the party who stonewalled discovery orders). Indeed, in this case, the City *did* succeed in making evidence related to its coverup of its participation in the potential *Jones* class action fraud unavailable—by dismissing its complaint.[5]

---

[5]     The majority also expresses its disagreement with *Padron v. Watchtower Bible & Tract Society of New York, Inc.* (2017) 16 Cal.App.5th 1246, "[t]o the extent that *Padron . . .* may be

32

All these cases demonstrate the trial court has discretion to impose monetary sanctions under section 2023.030, without regard to the requirements of other sections of the Discovery Act, when the sanctioned party has engaged in an extensive pattern of discovery abuse.  Of course, the facts of each case are always different.  But there is no reason in logic or common sense to limit the court's discretion to circumstances where the pattern of abuse is such that the evidence no longer exists, or cannot be obtained, or is concealed until it is too late.  Years-long, willful obstruction of the discovery process ultimately resulting in voluntary dismissal by the perpetrator of the abuse is equally egregious.

To summarize:  The *Kwan* case on analogous facts found it was an abuse of discretion *not* to award monetary sanctions under section 2023.030 for the discovery misconduct visited upon the defendants in that case.  The *London* case tells us the "[t]o the extent authorized" language simply refers to whether a discovery method statute authorizes the *type* of sanction imposed.  Multiple other cases have imposed sanctions under section 2023.030 without regard to the requirements of specific

_____

read to suggest that the court has inherent authority under its supervisory powers to award attorney fees as monetary sanctions for discovery abuse" (maj. opn. *ante*, at pp. 61–62).  In *Padron,* the court concluded the superior court was authorized to impose monetary sanctions of $4,000 per day on a party "who steadfastly refuses to comply with a discovery order." (*Padron,* at pp. 1248–1249, 1264; *id.* at p. 1250 [the defendant "has obstinately refused to comply with the order, consistently attempting to reargue the very discovery issues the court already decided"].)  I see no need to address the issue of the court's inherent authority to impose monetary sanctions.

discovery statutes when there is an extensive pattern of discovery abuse.  And no other case has done what the majority has done.

There is no ambiguity about what conduct the court found sanctionable.  PwC laid out the City's discovery abuses in excruciating detail in its comprehensive motion for sanctions, and did so as well at numerous hearings on motions it successfully brought or opposed.  The trial court identified the two general categories of discovery methods that were misused:  withholding documents ("PwC's efforts to compel the production of . . . the *Jones v. PwC* Complaint and information surrounding the drafting of that document") and asserting false claims of privilege to prevent document production and depositions ("the City's attempts to cover up its knowledge and participation in the potential *Jones* fraud").  The court identified the number of hours and amount of fees PwC claimed in respect of each category.

The court described at length from the bench the abuses for which the sanctions were imposed, expressly identifying at least seven of the motions PwC successfully made or opposed.  There is no question that monetary sanctions are authorized for those kinds of discovery violations.  And no principle of appellate review requires a court to recite the specific statutes it finds were violated if the court adequately explains its analysis and findings in support of an order; in such a case, we presume correctness.  Given the very detailed, explicit record in this case, I see no error and no prejudice of any kind in either PwC's or the court's failure to recite each separate discovery statute the City violated.

As a final comment, I also take issue with the majority's apparent view that its unprecedented construction of the statute—the first in the several decades since the Discovery Act was enacted—is the one "that comports most closely with the

34

Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose . . . ." (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.)  (Maj. opn. *ante,* at pp. 38–39.)  The majority seems to agree that the Legislature had a " 'deep-seated concern that [litigants] do not undermine the goals of civil discovery by practices detrimental to its proper operation.' "  (Maj. opn. *ante,* at p. 45.)

That is exactly what the City did here.  The majority's conclusion that the only way a trial court can deal with an egregious pattern of stonewalling and falsity in discovery responses is by adhering to the procedural prerequisites of each separate discovery statute for each particular discovery violation does not, in my view, comport with Legislative intent, much less with decades of precedent.

Because I conclude there was no abuse of discretion in any respect, I would affirm the trial court's order awarding sanctions of $2.5 million to PwC for reasonable expenses incurred as a result of the City's egregious misuse of the discovery process.


GRIMES, J.*

\*      Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

35